# UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF MISSOURI
### WESTERN DIVISION

| | |
|---|---|
| RICHARD L. ITTEILAG,<br>On Behalf of Himself<br>and All Others Similarly Situated,<br><br>              Plaintiff,<br><br>      v.<br><br>AQUILA, INC., RICHARD C. GREEN, JR.,<br>ROBERT K. GREEN, AVIS GREEN<br>TUCKER, STANLEY O. IKENBERRY,<br>HERMAN CAIN, IRVINE O. HOCKADAY,<br>JR., JOHN R. BAKER, L. PATTON KLINE,<br>ROBERT F. JACKSON, JR., SHIRLEY ANN<br>JACKSON, RONALD T. LEMAY, GERALD<br>L. SHAHEEN, and HEIDI E. HUTTER,<br><br>          Defendants. | **CIVIL ACTION NO.**<br><br>**CLASS ACTION COMPLAINT FOR<br>BREACH OF FIDUCIARY DUTY**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff Richard L. Itteilag, individually and on behalf of other persons similarly situated, brings this Class Action Complaint, upon personal knowledge as to himself and his own actions, and upon information and belief as to all other matters, against Aquila, Inc. ("Aquila" or the "Company"), Richard C. Green, Jr., Robert K. Green, Avis Green Tucker, Stanley O. Ikenberry, Herman Cain, Irvine O. Hockaday, Jr., John R. Baker, L. Patton Kline, Robert F. Jackson, Jr., Shirley Ann Jackson, Ronald T. Lemay, Gerald L. Shaheen, and Heidi E. Hutter (collectively, "defendants"). Plaintiff's allegations against defendants are based upon the investigation conducted by and under the supervision of plaintiff's counsel, which included a review of United States Securities and Exchange Commission ("SEC") filings by Aquila, UtiliCorp United, Inc. ("UtiliCorp"), regulatory filings and reports, securities analysts' reports

{0088167.DOC}

and advisories about the Company, and press releases, media reports, and other public statements issued by and/or about the Company, as well as media reports about the Company.

## <u>NATURE OF THE ACTION</u>

1.      This is a civil enforcement action brought pursuant to § 502 of the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1132(a), for plan-wide relief on behalf of the participants and beneficiaries of the Aquila Retirement Investment Plan (the "Plan") throughout the duration of the Plan's existence.  The Plan was formerly known as the UtiliCorp United Inc. Retirement Investment Plan, and/or the UtiliCorp United Inc. Savings Plan.   The Plan is a defined contribution plan.

2.      The Plan is administered by Aquila on behalf of employees as a tax-advantaged savings account for retirement and other long-term investment goals.

3.      Plaintiff, a former employee of Aquila, became an employee of Aquila, then known as UtiliCorp, on November 12, 1991.

4.      Plaintiff alleges that defendants are each fiduciaries of the Plan, and that each violated ERISA § 409 [29 U.S.C. § 1109] by breaching their duties owed to him and the other participants and beneficiaries of the Plan in connection with the Plan's holding of Aquila stock. Plaintiff alleges that defendants are obligated to make the Plan whole for losses suffered as a result of their failure to fulfill their fiduciary obligations.

5.      Because plaintiff's allegations apply to all of the Plan's participants and beneficiaries, plaintiff brings this action as a class action on behalf of himself and all the participants and beneficiaries of the Plan during the relevant period as provided by ERISA's authorization for individual participants to sue for plan-wide relief for breaches of fiduciary duty.

6. Aquila is an international energy company employing thousands of individuals throughout the United Stated, many of whom were Plan participants during the Class Period (defined below).

7. During the Class Period (January 1, 1999 to May 5, 2004), defendants, through their fiduciary responsibilities, were responsible for determining what investment options would be available to participants in the Plan and were responsible for monitoring those investment options. Throughout the Class Period, the investment options of the Plan included diversified investment options, such as mutual funds, and a fund that invested solely in Aquila common stock (the "Aquila Stock Option").

8. To encourage employee ownership of Aquila stock, defendants utilized various means to promote Aquila stock throughout the Class Period, including but not limited to (i) encouraging employees to invest heavily in the Aquila Stock Option through speeches by top executives praising employees for their Aquila stock ownership, publicly designating employees invested in Aquila stock as "Aquila partners" in the Company's literature, and other such forms of direct encouragement; (ii) matching employee plan contributions with Aquila stock; (iii) providing Aquila stock equal to 3% of employee pay in an employee stock contribution plan; and (iv) providing employees a 15% discount on Aquila stock through a stock purchase plan.

9. The Aquila Stock Option was selected as the primary investment option among a significant portion of Plan participants. At the end of the year 2000, approximately 85% of Aquila employees owned shares of the Company's common stock through the Plan and approximately 59% of Aquila employees' combined employer-provided benefit, savings and retirement investment Plans were in the Company's common stock. Employee ownership through the Plan collectively represented 13% of all Aquila shares outstanding.

10. Prior to and during the Class Period, defendants capitalized on the perception of employees that the Company was a conservative and safe investment to encourage employees to acquire and retain Aquila stock. Defendants were aware that the Company was perceived as a conservative investment, through its various contacts with analysis, investors and understanding of the demographic make-up of those who held its stock. Indeed, management of the Company internally touted the large number of retirees that held the Company's stock in order to bolster their message that the Company's stock was a conservative investment. However, as of early 1999, the conservative business focus of the Company that gave employees comfort in maintaining and adding Aquila stock in their Plan began to rapidly change. At that point in time, rather than continuing to focus on its business as a traditional utility, Aquila began to transition itself into a business focused on the unregulated energy trading markets.

11. During the Class Period, numerous events ultimately led to what was effectively the end of the very short boom days of the energy trading market, dominated by, among others Aquila and Enron. This "boom" period would be marked by market manipulation and "wash trades," [1] with efforts by those in this business sector to create the appearance that the energy trading market was substantially larger than it really was, in every regard, including the size of the trades and the liquidity of the energy commodity contracts. The Company, which had become heavily involved in the energy trading market and had transformed itself into a major player in that market, suffered a near collapse and its stock price declined over 94% during the Class Period. The Company's stock price has never recovered.

---

[1] A "wash," or "round trip," trade is a prearranged transaction where there are simultaneous buys and sells of the same commodity at the same price, such that there is no actual change in ownership, the trades have no bona fide business purpose and produce no real gains other than to (continued…)

12.     As alleged below, defendants breached their fiduciary duties to the Plan and Plan participants, including, *inter alia*, their duty to provide complete and accurate information material to the circumstances of Plan participants and beneficiaries so that Plan participants could make informed investment decisions concerning their Plan investments. As a result of incomplete and misleading representations about the business model and characteristics of the transforming Aquila entity, Plan participants were led to believe that their investment in Aquila stock was still a conservative investment, which was hardly the case given the dramatic change in Aquila's business model. In fact, defendants encouraged Plan participants to continue to invest in Aquila stock even though Aquila stock was no longer an appropriate investment option for Plan participants, and certainly not appropriate as the largest portion of a retirement investment. During the Class Period, as third party market participants such as corporate credit ratings agencies and analysts voiced their concerns over the Company's business operations and financial position, the Company downplayed any exposure to risk, insisted that the changing market environment presented "opportunities" to the Company, and minimized concerns that a changing market environment would negatively impact operations of the Company and its ultimate business success.

13.     In addition, defendants breached their fiduciary duty to independently investigate and continually monitor the merits of each investment alternative in the Plan and to eliminate inappropriate investment options. Defendants were aware, or should have known, of the distress of the energy trading market, of the widespread improprieties occurring in the energy trading market, of the risks associated with being highly leveraged in the energy trading market and of

_____
(…continued)
enable the inflation of reported revenues and trading volumes in order to make a market appears (continued…)

the significantly detrimental impact the collapse of such a market would have on the Company's stock. Nonetheless, defendants failed to reconsider the adequacy of Aquila stock as a Plan investment option and failed to recommend that the Plan dispose of its Aquila stock, or remove Aquila stock as an investment option, or, at a minimum, limit the amount that Plan participants could invest in the Aquila Stock Option as a percentage of their total Plan investment.

## JURISDICTION AND VENUE

14. The claims asserted herein arise under and pursuant to § 502 of the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1132(a).

15. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and ERISA § 502(e)(1) (29 U.S.C. § 1132(e)(1)) and personal jurisdiction over defendants pursuant to Fed. R. Civ. P. 4(k).

16. Venue is proper in this District pursuant to ERISA § 502(e)(2) (29 U.S.C. § 1132(e)(2)). Many of the acts charged herein, including the breach of fiduciary duties, occurred in this District. The Company's chief executive offices and principal place of business from which the breach of fiduciary duties originate are located in Kansas City, Missouri.

## THE PARTIES

17. Plaintiff Richard L. Itteilag is a resident of Virginia. Plaintiff was at relevant times a participant in the Plan within the meaning of ERISA § 3(7) (29 U.S.C. § 1002(7)). As of March 31, 2003, plaintiff held approximately 14,332 shares of Aquila stock in the Plan. During the Class Period, defined below, the value of plaintiff's Aquila stock holdings declined from its

---

(…continued)
more liquid than it is or create artificial prices to assist in manipulating the market.

highest value of approximately $813,937 to approximately $62,630 by May 5, 2004, *a decline of 92%*.

18.     Defendant Aquila is incorporated under Delaware law and maintains its principal executive offices at 1100 Walnut Street, Kansas City, Missouri.  Aquila was known as UtiliCorp before it changed its name in March, 2002, in part because it reacquired the publicly held shares of a subsidiary, Aquila, on or about January 4, 2002.  Aquila is a multinational energy solutions provider.  During the relevant period, Aquila common stock traded in an efficient market on the New York Stock Exchange (the "NYSE") under the symbol "UCU" until March 15, 2002, whereafter it adopted the symbol "ILA."

19.     At all times relevant to this Complaint, Defendants Richard C. Green, Jr. ("Richard Green"), Robert K. Green ("Robert Green"), Avis Green Tucker ("Tucker"), Stanley O. Ikenberry ("Ikenberry"), Herman Cain ("Cain"), Irvine O. Hockaday, Jr. ("Hockaday"), John R. Baker ("Baker"), L. Patton Kline ("Kline"), Robert F. Jackson, Jr. ("Jackson") were individual members of the Company's Board of Directors (the "Board").  Shirley Ann Jackson ("Jackson") was a director from January, 2000, to May, 2001 and  Ronald T. LeMay ("LeMay") was a director from October, 1999, to May, 2000.  Gerald L. Shaheen ("Shaheen") became a director in August 2001, while Heidi E. Hutter ("Hutter") became a director in February, 2002.  Robert Green was also the President, Chief Operating Officer ("COO") and Chairman of the Board.

20.     At all relevant times defendants Hockaday and Cain were members of the Compensation Committee responsible for establishing and administering compensation programs and plans.  Defendant Kline was a member of the Compensation Committee throughout 1999 until 2000.  Defendant Ikenberry became a member of the Compensation Committee in 2000.

21.     At all relevant times defendants Baker and Robert Green were members of the Pension Committee responsible for establishing and administering the retirement plan and certain other employee benefit plans.  Defendant Tucker was a member of the Pension Committee throughout 1999 until 2000.  Defendant Jackson became a member of the Pension Committee in 2000.

22.     John Does 1-30 were the individual members of the retirement committee(s) of the Plan, whose identities are currently not known.  At all times relevant, the Plan was administered by a retirement committee(s) consisting of persons appointed by the Board of Directors of Aquila.

## CLASS ACTION ALLEGATIONS

23.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23 on behalf of himself and a class (the "Class") of all persons similarly situated who were participants in or beneficiaries of the Plan at any time during the Class Period.  Excluded from the Class are defendants, directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors, or assigns and any entity in which defendants have or had a controlling interest.

24.     The prerequisites of subdivision (a) of Rule 23 are met as follows:

a.      Rule 23(a)(1).  The members of the Class are so numerous that joinder of all members is impracticable.  During the Class Period, there were thousands of current and former employees who were participants in or beneficiaries of the Plan.  While the exact number of Class members is unknown to plaintiff at this time and can only be ascertained through appropriate discovery, plaintiff believes that there are thousands of members in the proposed Class.  Plan participants and beneficiaries may be identified

from records maintained by Aquila or the Plan's trustee and may be notified of the pendency of this action by mail.

b.  Rule 23(a)(2). Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by defendants' wrongful conduct in violation of federal law that is complained of herein and defendants' breach of fiduciary duty.

c.  Rule 23(a)(3). Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in ERISA class actions as well as other class actions and securities litigation.

d.  Rule 23(a)(4). There are questions of law and fact common to the Class, including, but not limited to, the following:

(1)  Did defendants breach their fiduciary duties owed to Plan participants and beneficiaries?

(2)  Did defendants' communications to participants provide complete and accurate information concerning the risks of investing in Aquila stock?

(3)  Did defendants provide false and misleading information, or fail to disclose material information, concerning the financial health of the Company?

(4)  What steps, if any, did defendants take to investigate and monitor whether it was appropriate to continue to offer Company stock as a retirement vehicle for Plan participants?

(5)  Did defendants take adequate steps to protect the Plan and recover Plan damages?

25.  The prerequisites of subdivision (b) of Rule 23 are met as follows:

a.      Rule 23(b)(1)(B).  As an ERISA breach of fiduciary duty action for plan-wide relief, this is a classic Rule 23(b)(1)(B) class action in that the prosecution of separate actions by the members of the Class would create a risk that adjudications with respect to individual members of the Class which would, as a practical matter, be dispositive of the interests of the other members not parties to the adjudications or substantially impair or impede their ability to protect their interests.

b.      Rule 23(b)(1)(A).  Alternatively, the prosecution of separate actions by members of the Class would create a risk of inconsistent or varying adjudications with respect to the individual members of the Class which would establish incompatible standards of conduct for defendants.

c.      Rule 23(b)(2).  Alternatively, defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive, declaratory or other appropriate equitable relief with respect to the Class as a whole.

d.      Rule 23(b)(3).  Alternatively, questions of law or fact common to the members of the Class predominate over any questions affecting only individual members, and a class action is superior to other available methods for the fair and efficient adjudication of the controversy.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them and there will be no difficulty in the management of this action as a class action.

## THE PLAN

26.      On information and belief, the Plan is an "employee pension benefit plan" within the meaning of ERISA § 3(2)(A), 29 U.S.C. § 1002(2)(A).  Further, the Plan is an "eligible

individual account plan" within the meaning of ERISA § 407(d)(3), 29 U.S.C. § 1107(d)(3), and also a "qualified cash or deferred arrangement" within the meaning of I.R.C. § 401(k), 26.U.S.C. § 401(k). The Plan is not a party to this action. Pursuant to ERISA, however, the relief requested in this action is for the benefit of the Plan. The Plan Sponsor Identification Number is 44-0541877 and the Plan Number is 021.

27.     Aquila is the administrator of the Plan. Aquila's Board of Directors established and appointed members to the Pension Committee which was designated with the responsibility for establishing and administering the Plan and certain other employee benefit plans.

28.     Subject to Internal Revenue Service limitations, participants of the Plan were permitted to contribute from 1% to 50% of their pay – in before and after tax payroll deductions – to the Plan. The Company's matching contribution for participants was a percentage of each employees contribution up to 6% of base salary.

29.     Participants directed the investment of their contributions to various investment options available in the Plan that were represented to them as suitable for their retirement contribution by apportioning the amount of their contribution to the various options available and selected. Once the Plan participant apportioned the contribution, the Plan participant's contribution in the Plan was directed in that same apportionment on a recurring basis unless the Plan participant chose otherwise. Most of the options available to Plan participants were diversified mutual funds. In contrast, the Aquila Stock Option provided that the employee's contribution be directed toward the purchase of Aquila common stock (UtiliCorp common stock, prior to the Company changing its name to Aquila). Participants were able to select Aquila (UtiliCorp) stock as a Plan investment beginning with the inception of the Plan in January 1, 1987, and throughout the Class Period.

30.     Participants' contributions were matched with contribution of Company common stock at certain specified percentages throughout the existence of the Plan until 2003.  In 2003, the Plan matched contributions in cash and invested that cash at the direction of the participant.

31.     The Plan contains a vesting process which is a calculation that determines when employees will gain ownership of Company contributions.  Participants immediately own all of their contributions plus any investment income earned on that money.  However, participants gain partial ownership of the Company's matching contribution at a rate of 20% per year in which the participant had at least 1,000 hours of service.  Consequently, after five years of service the participant would own 100% of the Company's matching contributions.  There are, however, some exceptions allowing for complete vesting for employees who otherwise would not qualify to own 100% of the matching contributions, including those whose employment terminates after the age of 55 who have not met the required years of service to have 100% ownership of matching contributions.

## DEFENDANTS' FIDUCIARY STATUS AND FIDUCIARY DUTIES

32.     Both before and throughout the Class Period, defendants had discretionary authority with respect to the management of the Plan and/or the management or disposition of the Plan's assets and had discretionary authority or responsibility for the administration of the Plan.

33.     During the Class Period, all of the defendants acted as fiduciaries of the Plan pursuant to ERISA § 3(21)(A) (29 U.S.C. § 1002(21)(A)) and the law interpreting that section.

34.     ERISA requires every plan to provide for one or more named fiduciaries, who will have "authority to control and manage the operation and administration of the plan."  ERISA § 402(a)(1) (29 U.S.C. § 1102(a)(1)).  Instead of delegating fiduciary responsibility for the Plan

to external service providers, the Company chose to comply with the requirement of section 402(a)(1) by internalizing the fiduciary function in various ways.

35.     During the Class Period, the Company was designated as Plan administrator, thereby making itself an ERISA fiduciary pursuant to ERISA § 402(a)(1).

36.     During the Class Period, the Board of Directors established and appointed members to the Pension Committee which was designated to make the Plan's fiduciary decisions and given the responsibility for establishing and administering the Plan and certain other employee benefit plans, thereby making the members of the Pension Committee ERISA fiduciaries.  Since the Pension Committee did not have an independent juridical personality, however, ordinary principles of vicarious responsibility attribute the fiduciary role of Pension Committee members to their principal, the Company, on whose behalf they acted.

37.     Moreover, ERISA treats as fiduciaries not only those persons so designated as fiduciaries under Section 402(a)(1), but also any other persons who act in fact as fiduciaries, i.e., perform fiduciary functions.  ERISA § 3(21)(A)(i) (29 U.S.C. § 1002(21)(A)(i)) makes a person a fiduciary "to the extent he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets . . . ."  During the Class Period, defendants performed fiduciary functions under this standard, and thereby also acted as fiduciaries under ERISA by, among other things, appointing Plan administrators and making statements to participants with respect to the Company, its financial results and its business prospects.

38.     An employer also acts in a fiduciary capacity under ERISA when an employer misleads employees about the nature and prospects of the company for the purpose of affecting the employees' ERISA plan elections.  By making misleading and incomplete representations

throughout the Class Period to induce employees into making and maintaining investments in Aquila common stock and to accept at face value the matched contributions provided in the form of Aquila common stock, the Company acted as a fiduciary under ERISA.

39.     ERISA further provides that in various circumstances non-fiduciaries who knowingly participate in fiduciary breaches may themselves be liable to the retirement plan.  To the extent any of the defendants are held not to be fiduciaries, they remain liable as non-fiduciaries who knowingly participated in the fiduciary breaches described below.

40.     Defendants breached their fiduciary duties to the Plan and the plaintiff  and other Plan participants, as set forth herein.

## SUBSTANTIVE ALLEGATIONS

### Background of the Company

41.     Aquila was founded in 1917 as Green Light and Power when Lemuel Green built a small power plant in Pleasant Hill, Missouri, south of Kansas City.  It went public five years later as West Missouri Power, though the Green family has always molded its policies.  West Missouri Power later merged with Missouri Public Service and took that name.  It served obscure Missouri towns and Kansas City suburbs.

42.     Prior to the beginning of the Class Period, Aquila (then known as UtiliCorp United, Inc.) was first and foremost an international energy provider.  It maintained electric and gas plants and sold the energy it produced.  It owned and operated generation and transmission assets as well as the "wires and pipes" that allowed the distribution of its electric and gas operations to its customers such as homeowners and business owners.  In the classic sense, the Company was a conglomeration of many "local" utility providers.  The Company provided real

energy products to real customers creating real revenues and resulting in real dividends and return on investment for investors.

43.      Throughout the 1980's and 1990's, the Company expanded its market footprint both in the United States and internationally by acquiring traditional asset heavy utility companies involved in the creation and distribution of energy products.  The companies acquired owned the power manufacturing plants and maintained the distribution lines.

44.      Company earnings prior to the Class Period reflected the conservative but reliable nature of Aquila's business focus.  Earnings before income tax ("EBIT") were $253.6 million, $326.2 million, $359.1 million and $351.4 million in 1995, 1996, 1997 and 1998, respectively. From 1995 through 1997, these earnings were comprised of the traditional components of the Company and did not include a material, if any, amount of earnings from what would become the Company's merchant trading division until 1998 when the merchant trading division contributed 10% to earnings.  The Company's earnings growth goal announced in mid-1997, and reiterated in its Annual Report for the fiscal year ended December 31, 1998, was to grow earnings per share by 8% per year.

**The Culture and Encouragement of Employee Ownership of Company Stock**

45.      Because of its history as a traditional utility company, Aquila stock was considered a conservative investment that, while not likely to create rapid growth or high returns, would produce predictable returns and adequate growth in a safe and conservative investment vehicle that offered dividends.  In addition to being categorized as a conservative, and safe investment vehicle alongside other traditional "utility" companies, Aquila was also viewed differently by employees and the market because, although it was public, it was family-directed.

This resulted in a tremendous amount of employee dedication and loyalty to Aquila and trust and confidence in the management directed by the Green family.

46.     Defendants built an atmosphere among employees that encouraged employees to purchase and hold Aquila stock, and to view themselves in partnership with the Company, by ownership of Aquila common stock, primarily through the Plan.  As set forth in the report filed with the SEC on Form 11-K on June 30, 2003, the "purpose of the Plan is to provide additional incentive and retirement security for eligible employees by . . . (c) affording employees an opportunity to increase their proprietary interest in the Company through ownership of its common stock."  Various other means were used to get employees to own more of the Company's shares, including the Aquila Stock Option in the Plan, the matching of 401(k) proceeds with Aquila stock, the Employee Stock Purchase Plan that provided employees the option to buy Aquila stock at a 15% discount to market prices, the employee stock contribution plan providing additional Aquila stock equal to 3% of employee pay, the granting of stock options to nearly all employees, the Common Stock Purchase Plan which allowed participants to purchase up to $10,000 per month of common stock at a five-day average market price, without sales commissions, and the Dividend Reinvestment Plan which allowed participants to automatically reinvest dividends earned from currently held Aquila shares into additional common shares at a 5% discount.  The Company's employee newspaper, Infonet, announced in 1998 that another round of stock options for employees would "join an umbrella of plans geared toward increasing employee ownership of the company."

47.     The Company and management continuously worked to develop an atmosphere conducive to employee acquisition and retention of Aquila stock, through direct encouragement and acknowledgment and praise to employees for their Aquila stock ownership.  (At an

employee meeting in 1994, defendant Richard Green said he would like to see 25% of the Company in employees' hands, according to Leo Morton, Aquila's Chief Administrative Officer from 1994 to 2000 when he became Senior Vice President and Chief Administrative Officer.) Since 1994, Aquila's annual report has listed employees whose shares in the Company were worth twice their annual pay, calling them "Aquila partners." The Company held internal meetings with executives from various divisions of the Company to discuss stock projections and Company growth in an effort to strengthen the argument for employee stock ownership. During the 2001 annual shareholders meeting, defendant Richard Green singled out these employees for a round of applause. The following statements, provided under the headings "Why We Like Employee-Owners" and "Employee Ownership – Ownership Matters" in the 2000 Annual Report, are representative of the systematic encouragement of employee ownership:

> Nearly 85% of UtiliCorp employees in North America own shares of the company's common stock. Altogether, they held more than 13 percent of all shares outstanding at the end of 2000. For many years, this level of employee ownership has set us apart in our industry. It means our people feel the pride of ownership, and translate that feeling each day into high quality customer service and energetic pursuit of ways to build shareholder value. Each year we recognize as UtiliCorp Partners the individuals who have reached a particularly high level of share ownership compared to salary level.

The foregoing was followed by a list of "Partners" containing the names of 633 employees and a chart entitled "A graph of UCU common stock performance in 2000", while comparing the performance of the Company's stock during 2000 to that of the S & P 500 and the S & P Utility Index. The graph noted the 59.49% increase in the Company's stock versus the 10.14% decline in the S & P 500 and the 54.30% increase in the S & P Utility Index.

48. To reinforce the importance of employee ownership and retention of Company stock, defendants fostered an atmosphere in which the performance of the Company's stock was made a considerable concern to employees. The emphasis on the Company's stock price

occurred, in part, through regular distribution of Company literature, including press releases issued to the public, to employees through the Company's internal mail system. This dissemination was achieved through the investor relations and communications departments. The importance of fostering this atmosphere was reflected by reviews of the Company's investor relations and communications departments, which were, in part, based on the success of those departments in the distribution of Company materials to employees.

49.     Because employees continued to believe in the conservative nature of their investments and because they had confidence in Company management and were subject to an atmosphere that promoted Aquila stock ownership, employee ownership of Aquila stock was substantial throughout the Class Period. At the end of 2000, approximately 85% of Aquila employees owned shares of the Company's common stock through the Plan and 58.7% of Aquila employees' combined employer provided savings and investment plans were invested in the Company's common stock. By mid-2001, Aquila shares accounted for two-thirds of the value of the Plan and were the Plan's largest single investment. In total, Aquila's employees owned roughly 13% of the Company, much of it through the Plan. As of December 31, 2001, and December 31, 2002, the Plan held 7,953,742 and 9,840,003 shares of Aquila common stock, respectively. The value of the Aquila common stock holding was $200,234,544 as of December 31, 2001, which dropped to a mere $17,416,805 as of December 31, 2002, representing a decline of $182,817,739 during this period. The cost basis of those shares was $161,341,395.

50.     At the same time that the Company encouraged employee stock ownership, it maintained policies making it difficult for employees to sell shares of Aquila stock in the Plan by locking up the matching shares contributed by the Company. Although the Company began to modify lock up periods in 1999 in order to allow employees of certain ages with 10 years in the

Plan to sell a limited percentage of their shares, Aquila officials decided after some discussion in late 2000 not to unlock shares for all employees in the Plan, according to Philip Beyer, Aquila's Director of Benefits Strategy and Design. In October, 2002, the Company changed the Plan's policy to allow employees under 50 with at least five years of service to sell one-fourth of their Company-contributed Aquila shares each year, but this still meant that at least 60% of those shares in the Plan were locked up so that employees could not sell them. In addition, by this time, the stock had already collapsed to under $5 per share and over $170 million of the Plan's value had thereby been wiped out.

**The Change in the Business Strategy of the Company**

51.    The conservative business focus that gave employees comfort in maintaining and adding to their Aquila stock ownership rapidly changed during the Class Period, as Aquila became a business entity entirely different than that which plaintiff and other employees knew and relied upon for their retirement investments.

52.    From a traditional energy utility company, Aquila rapidly leveraged its traditional energy assets to transition into a Company driven by its energy merchant services unit. This new business focus was engaged in the relatively new, speculative market of trading energy commodities. In essence, Aquila leveraged its traditional energy assets in order to actively trade its energy production so that, allegedly, the energy assets could be bought and sold on the open market. This would purportedly allow Aquila to sell its energy products in broader markets and provide customers with the opportunity to more actively plan their energy requirements through the use of hedging instruments and commodity contracts. In short, beginning in early 1999, Aquila had become a trader in a commodity market for energy.

53. The unit of the Company responsible for energy commodity trading activities was part of Aquila's Energy Marketing unit, a unit acting in an "industry [] premised on large volume sales with relatively low margins," according to the Company's Annual Report. Components of this unit would later become the Aquila Merchant Services division and were, initially, a mechanism for the distribution of the energy products that were the traditional market of Aquila.

54. In its Annual Report for the period ended December 31, 1998, filed on Form 10-K with the SEC on March 26, 1999, the Company discussed the purpose of its energy trading activity, but conveyed to investors that such trading was limited to supporting the traditional energy production business of the Company:

> We have developed an energy marketing, trading and risk management system at Aquila that will support substantially greater marketing and trading volumes without the need for material additional investment.
>
> " . . . .
>
> TRADING ACTIVITIES:
> PRICE RISK MANAGEMENT ACTIVITIES
> We trade energy commodity contracts daily. Our trading activities attempt to match our portfolio of physical and financial contracts to current or anticipated market conditions. Within the trading portfolio, we take certain positions to hedge physical sale or purchase contracts and we take certain positions to take advantage of market trends and conditions. We record most energy contracts--both physical and financial--at fair market value. Changes in value are reflected in the consolidated statement of income. . . . We refer to these transactions as price risk management activities.

55. The Company increased its trading activity throughout 1999:

    a.    In the Company's report for the quarter ended March 31, 1999, the Company stated "funds on deposit increased by $29.5 million. The increase relates to margin requirements and increased trading activities at Aquila Energy during the first quarter of 1999."

    b.    In the Company's report for the quarter ended June 30, 1999, the Company stated that an "increased volumes in the power trading business was the primary

contributor" to an increase in accounts receivable and "on a year-to-date basis, gas and power trading volumes increased 19% and 109%, respectively."

       c.     In the Company's report for the quarter ended September 30, 1999, the Company stated, "we utilize accounts receivable sales programs to efficiently manage our working capital and provide immediate liquidity. In September 1999, due to growth in the trading business, we increased our total capacity under these programs by $125 million to $405 million. At September 30, 1999, we had sold approximately $370.8 million of receivables under these programs." Furthermore, "gas and power trading volumes were up over the prior year by 7% and 78%, respectively" although "marketing and trading EBIT decreased $4.3 million on a year-to-date basis compared to 1998. Gas and power trading volumes for the nine-month periods increased 15% and 94%, respectively."

     56.     The Annual Report for the period ended December 31, 1999, provided identical descriptions of Aquila's Energy Marketing unit as that set forth in the Annual Report for the period ended December 31, 1998. Despite the unchanged description of its business, Aquila's activities, including both its Wholesale Services and Capacity Services segments, would account for $82.8 million, or approximately 20%, of the Company's $414 million EBIT for the 1999 fiscal year, according to an SEC Form 425 later filed on November 14, 2001.

     57.     On December 13, 2000, the Company announced that it was spinning off a portion of its Aquila Energy Corporation subsidiary with the intention of complete divestiture by the end of 2001. The units being spun off included those comprising what would become the Aquila Merchant Services unit. This would mark the apparent separation of the two very different companies. As described in the press release, UtiliCorp was "an international, growth-

oriented energy and services company" serving millions of customers and Aquila was a "leading wholesale energy merchant." The press release further stated, in relevant part:

> "First and foremost, these transactions will increase Aquila's capital financing flexibility by allowing Aquila to independently access the capital markets on an efficient basis," said Richard C. Green, Jr., chairman and chief executive officer of UtiliCorp. "The separation also will increase Aquila's strategic focus and provide a targeted investment for our stockholders."

> "Aquila's marketing and risk management business and electricity and natural gas asset management business are all quite different in nature from UtiliCorp's regulated utility business," said Robert K. Green, president and chief operating officer of UtiliCorp and chairman of Aquila. . . .

58.     Despite the above disclosures about the Company's increased energy trading business, defendants failed to adequately inform the Plan participants of the extreme risks that were quickly becoming part of the Company and failed to consider such risks when determining the adequacy of the Aquila Stock Option for the Plan.  Indeed, the December 13, 2000 announcement regarding the spin-off of the trading unit had the effect of leading Plan participants to believe that the risks inherent in the Company's growing trading business were being removed from the Company.

59.     Aquila's Energy Merchant segment continued to grow throughout fiscal year 2000, but it was still largely associated with Aquila's Capacity Services, which produced and distributed traditional energy products.  As indicated in a preliminary prospectus supplement dated February 23, 2001:

ENERGY MERCHANT -- AQUILA

> Our Energy Merchant segment markets and trades wholesale natural gas, electricity and other commodities in North America and Western Europe through Aquila. . . . Aquila also provides risk management services to its customers and provides capital in the form of collateralized loans to oil and gas producers. Our strategic objective within this business segment is to aggressively expand this business by pursuing opportunities created by the unbundling and restructuring initiatives in the commodity markets, including the natural gas, power and

bandwidth markets, by maximizing Aquila's current asset base and by leveraging its commodity merchant skills. Aquila's business is conducted through two interconnected and complementary business groups, Wholesale Services and Capacity Services.

"....                           WHOLESALE SERVICES

Aquila provides commodity risk management services, focusing on the energy industry. For the twelve months ended September 30, 2000, according to NATURAL GAS WEEK, Aquila was ranked as the third largest wholesale marketer of power and natural gas on a combined basis in North America.

[A chart illustrated the growth of the energy marketing and trading volumes since 1996, showing growth of 2.8%, 8%, 12.6%, 18% and 18.4% during the years of 1996, 1997, 1998, 1999 and 2000, respectively.]

"....                           CAPACITY SERVICES

        Aquila owns, operates and contractually controls electric power generation assets; natural gas gathering, transportation, processing and storage assets; and a coal blending, storage and handling facility. Aquila has approximately 4,100 MW of electric power generation capacity . . . 30,000 Bbls/d of natural gas processing capacity. . . natural gas storage capacity and a coal terminal facility . . . .

        Aquila's energy assets complement its wholesale marketing and trading businesses by providing natural gas and coal supplies, a source of reliable power supply and an enhanced ability to structure innovative products and services. . . .

        60.     In early 2001, the Company touted the expansion in the traditional energy products market. For example, on February 27, 2001, it announced that Aquila had "agree[d] to buy 10 more turbines from General Electric" resulting in orders of 21 turbines in the prior 12 months which would give Aquila control or have "under development more than 4,100 megawatts of power."   On March 14, 2001, the Company announced that UtiliCorp intended to "[p]urchase [p]ower [g]eneration" from a 165 wind turbine wind energy project in Kansas.

        61.     The Company's discussion of Aquila and its Energy Merchant trading business in the UtiliCorp Annual Report for the period ended December 31, 2000, filed on Form 10-K with the SEC on March 29, 2001, is the same as that provided in the Annual Report for the period

ended December 31, 1998.  However, various sources, including the preliminary prospectus supplement, *supra* ¶59, and presentations to analysts, and a report filed pursuant to SEC Rule 425 on November 14, 2001, indicate that Aquila's Wholesale Services and Capacity Services segments had contributed only $189 million of the $540 million, or 35% of the Company's EBIT for the fiscal year 2000.

62.     In the Company's "Investor Magazine," described as "UtiliCorp's annual report newsmagazine for shareholders," (the "2000 Investor Magazine"), filed with the SEC on March 29, 2001 as Exhibit 13 to its Form 10-K, which was part of its Annual Report for fiscal year 2000, the Company elaborated on the role and impact of Aquila and its Energy Merchant business, businesses that were to be spun off from UtiliCorp:

> We expect the creation of a separately traded stock for Aquila to increase Aquila's strategic focus and provide a targeted investment for that business. Investors will be better able to determine Aquila's fair market value when its shares are separately traded.
> Far from being a start-up, Aquila is a major company in its own right, with annual sales of more than $26 billion and assets of nearly $8 billion.
>
> ". . . .Aquila's Growth
>
> The strong performance of Aquila was a major driver of our record results in 2000. Its EBIT for the year was $191.1 million, up 140 percent from 1999. Aquila's Wholesale Services earned $144.2 million, a 424 percent increase that reflects excellent execution in a very dynamic pricing environment. . . .
>
> Increasingly, the marketplace has recognized the need for sophisticated risk management tools that help protect companies from various business risks, including weather. To meet this need, Aquila has developed a steadily growing family of custom-designed risk management products such as Guaranteed-Weather(R) and GuaranteedGeneration(SM). Its financial results reflect the increasing strong demand for these products.
>
> Aquila's Capacity Services benefited from having additional generating capacity in 2000. One of Aquila's key strategies has been to increase the size of its power generation portfolio. By year end, it owned or controlled about 4,100 megawatts of generation in operation, under construction or being developed.

63.     The 2000 Investor Magazine contained a bolded quote that was set out against the rest of the text that stated, "One of Aquila's key strategies has been to increase the size of its power generation portfolio." Following this text, the Company discussed the expansion of its traditional energy production facilities, including the $225 million purchase of GPU International ("GPUI") and investments in nine power projects in various stages of development.

64.     The 2000 Investor Magazine described some of the major initiatives the Company had undertaken in advancing its Energy Merchant Services trading business. This included the creation of an energy trading consortium with five other energy firms created in early 2000, the subsequent joining of the consortium with The Intercontinental Exchange ("ICE"), an energy commodities exchange, and the development of YourEnergySource.com, an online trading platform for energy buyers and sellers. Commenting on the investment in ICE, Janine McArdle, then first vice president of Aquila's e-commerce, stated, "Aquila's investment in the IntercontinentalExchange complements our core business as a risk merchant."

65.     The 2000 Investor Magazine emphasized Aquila's ownership and control of traditional energy products from which any trading mechanism or risk strategy were purportedly based. In fact, the report highlighted that Aquila had more ownership and investments in traditional energy production assets than the Company ever had in the past. (Some of these "assets" were tolling agreements, mere contract based obligations that would later prove to be detrimental to the Company.) The Company highlighted its purchase of GPUI, the beginning of production of power from its jointly owned Aries plant and numerous projects in development including two energy plants and five other development projects scheduled to begin delivering power in 2002. Under the heading "Energy Merchant Aquila Powers Up," the Company stated:

> Development projects and an acquisition add considerable scale to the company's growing portfolio of electric generation.

"... In the 1980s and most of the '90s, the company invested in independent power projects, often as a limited partner. Today, in addition to managing its investments in 11 projects, Aquila is actively managing the day-to-day operations of six plants in five states and developing or co-developing a number of new generating plants. It also has "tolling" contracts with generation facilities in Missouri, Mississippi, Illinois and Louisiana that allow Aquila to sell the plants' output on the wholesale power market.

"... The nature of Aquila's involvement in the business of electric generation has changed to include not just investor, but operator and developer.

"This acquisition [GPUI] should help provide a stable base for Aquila's ongoing efforts to expand our generation business," says Kevin Calhoon, senior director, asset investment, who led the Aquila team that worked on the GPUI purchase. . . .

The GPUI acquisition is just the beginning for Aquila's Asset Investment group. The group's goals include finding more opportunities to buy generation assets that enhance Aquila's future earnings.

Growth means planning. For a good indicator of Aquila's growth plans, just look at its recent orders for another 21 gas turbines--costing about $432 million--to support its development efforts in 2001 and beyond.

" .... Aquila has always been rich in marketing and risk management strengths," says Ed Mills, president and chief operating officer. **"Now we're adding to the equation a strong portfolio of power-producing assets that balances the risks of the marketing business and provides access to plenty of electric generation we can bring to market.**

66.    The photograph on the cover of the 2000 Investor Magazine was consistent with the contents therein, which characterized the Company's business as being centered on, or heavily supported by, traditional energy products.  The photograph is described as follows:

This year's cover photo highlights the recent steps taken by UtiliCorp's Aquila subsidiary to expand its portfolio of electric generation. Pictured. . . is one of six generating facilities Aquila acquired in December 2000. The company also currently has several new power projects in various stages of development.

67.    On April 27, 2001, UtiliCorp completed the initial public offering of its Aquila subsidiary.  As stated in the original December 13, 2000 announcement, the Aquila initial public

offering was designed as the beginning of UtiliCorp's complete divesture of Aquila by the end of

2001, which would have isolated the risks of Aquila from UtiliCorp investors and Plan

participants who were heavily invested in UtiliCorp stock. The Company offered 19,975,000

Class A Aquila common shares at $24.00 per share. UtiliCorp recognized $110.8 million on the

offering and would thereafter continue to own 80% of Aquila.

     68.    On July 19, 2001, the Company issued a press release entitled "UtiliCorp Expects

300 Percent Increase in Second-Quarter Earnings, With Performance Driven by Aquila's Strong

Results," or $142-148 million in earnings versus $29.3 million. Therein, defendant Richard

Green exulted the performance of the energy merchant business and its record performance.

     69.    On August 8, 2001, Aquila announced financial results for the second quarter of

fiscal year 2001, the quarter ended June 30, 2001, which included net income of $101.3 million,

"an increase of 367% over the prior year's second quarter" and sales of $9.9 billion, double the

amount for the same period the prior year. The EBIT from Commodity Services, including

power and gas marketing, emissions allowance trading, and risk management products, rose

1,283% to $116.2 million. Keith Stamm, Aquila's CEO, lauded the strong demand for the

Company's products, the higher financial results across all business segments, the "excellent

asset management," and earnings diversity. The press release further stated, in part:

> Aquila's Wholesale Services segment, consisting of the Commodity
> Services and Client Services businesses, had EBIT of $148.5 million for the
> second quarter, up from $25.3 million in last year's period. Outstanding execution
> combined with favorable market conditions were key factors in the higher
> earnings from Commodity Services, which had EBIT in the 2001 quarter of
> $116.2 million compared to $8.4 million in last year's second quarter.
>
> Client Services, Aquila's structured products and services business,
> continued to post excellent growth. Second-quarter EBIT rose 91 percent
> compared to a year earlier, primarily driven by a 21 percent increase in deal flow.
> . . .

70. A *Dow Jones Business News* article published August 8, 2001, entitled "Aquila's 2nd-Quarter Profit Soared on Rising Returns from Energy Trading," reported that Aquila's strong earnings growth results from "sharply higher returns from trading natural gas and electricity" though "Aquila also continues to develop new generation capacity."

71. On August 9, 2001, UtiliCorp announced EBIT earnings for the second quarter of fiscal year 2001 of $334 million, an increase of 221% from the year earlier. The press release stated that the earnings growth of 389% and sales growth of 79% over the same period a year earlier were primarily the result of Aquila's "strong results," which, in part, UtiliCorp realized given its 80% ownership interest. The release stated, in part:

> "UtiliCorp's domestic networks business continues on track for our targeted 3-5 percent growth," he [Robert Green] said, "and our international networks continued to help fuel our growth in earnings before interest and taxes (EBIT), contributing a $17.3 million increase to second-quarter EBIT, after adjustment for the deconsolidation of our New Zealand investments in June 2000."

72. In mid-October, 2001, the stock price of Enron Corporation ("Enron") began a rapid decline as rumors, allegations, and speculation of corporate fraud were confirmed and publicized. The stock dropped from approximately $37 in mid-October, 2001, to less than one dollar by the end of December, 2001. This event, and the information relating to the widespread market fraud that was the centerpiece of the machinations behind the Enron fraud, put the world on notice of the manipulative practices that had perpetrated the entire energy trading market. Such practices included abuse of "Mark-to-Market Accounting," and round trip trading. The details of the abuses as disseminated throughout this period are delineated in ¶¶36, 39, 42, 121(e), (j), 214(e), 300(e), (j), (l), (m), 624, 628-29, and 640 of the first amended consolidated complaint filed in In re Enron Corporation Securities Litigation, No. H-01-3624 (S.D.Tex. filed May 14, 2003). The Enron collapse would cast light upon similar conduct by numerous other

market participants who knowingly facilitated and perpetuated the façade of a burgeoning energy trading market and exaggerated the growth that similar "developing" commodity markets were experiencing. One such participant in that market was Aquila.

73. On October 24, 2001, *Reuters* published an article concerning Aquila's announcement, made the same day, that it would exceed analysts expectations for the third quarter of fiscal year 2001. Despite the positive announcement, Aquila's shares declined $3.15, or 13%, that day. The article attributed an analyst as blaming Enron for Aquila's troubles and noting that companies with prominent trading and marketing business, like Aquila, were experiencing a "spillover effect."

74. On November 6, 2001, with UtiliCorp common stock trading at $30.00 per share, *Megawatt Daily*, published an article entitled "Aquila a 'year ahead' on earnings" discussing Aquila's earnings for the third quarter of fiscal year 2001, in which it reported earnings growth of approximately 62% versus the same period in the prior year. The article attributed defendant Robert Green as stating that Aquila was "essentially one year ahead of the [earnings] commitment we promised in the IPO of Aquila," that the Company "has demonstrated its ability to continue creating shareholder value during a variety of market cycles." The article also stated, as follows:

> [Robert] Green noted "this growth was delivered in a market that was dramatically different than last year . . . we capitalize on volatility, but we don't count on it." **He said the company's strong growth was driven by client services and capacity services, which grew 60% and 96% respectively.**
>
> ". . . . **In the company's trading segment, Stamm said the trend is now towards fewer transactions, but an increase in the size of trades. . . . "Commodity trading provides liquidity and fuel for the growth of the business,"** he said.

75. In a press release issued on November 7, 2001, announcing UtiliCorp's earnings for the third quarter of fiscal year 2001, period ended September 30, 2001, defendant Robert Green stated:

> "At Aquila, we continue to see increasing client demand for our risk management solutions . . . In addition, our recent capacity acquisitions are performing beyond our expectations. Consistent execution, client focus, and strong asset management skills have been key to our continued success . . . Our network businesses continue to help fuel our core growth in earnings before interest and taxes (EBIT). Combining that with the solid results from Aquila, UtiliCorp continues to be on track to deliver at least 15 percent earnings growth this year."

**UtiliCorp Terminates Plan for Complete Divestiture of Aquila and Opts to Reacquire**

76. With full knowledge of the challenges facing Aquila and UtiliCorp as a result of Aquila's significant investment and activity in the energy trading markets and the recent disclosures effecting the tenuous nature of the energy trading market, defendants realized that Aquila faced a very uncertain future. In an effort to rescue Aquila, defendants made a decision that would seal the fate of UtiliCorp investors, including Plan participants – to repurchase the 20% of Aquila that had been spun off so that Aquila could use the asset base of UtiliCorp in order to attempt to sustain the Company. On November 7, 2001, UtiliCorp announced that it no longer intended to divest itself of Aquila and would instead reacquire the shares it had spun off. This was a complete reversal of its initial plans for complete divestiture of Aquila as stated in its December 13, 2000 announcement of the Aquila spin-off, and communicated thereafter, and effectively marked a significant change in strategy for the Company and would impact the strategy and the future of UtiliCorp in a manner that only defendants knew. By this decision, defendants sacrificed the shareholders and Plan participants of UtiliCorp in an attempt to shore up Aquila, and thereby hide the monumental mistakes the Company had made by exposing itself

so substantially to the energy trading market.  In a the press release entitled "UtiliCorp Plans

Exchange Offer For The 20% Of Aquila It Does Not Own," the Company stated:

> "**The recent significant changes in the merchant energy sector, the general economy and the impact of these changes on the capital markets were definitely factors in the board's decision**," said Richard C. Green, Jr., chairman and chief executive officer. "The most significant influence, however, was the realization that greater shareholder value could be obtained by recombining the financial strength of UtiliCorp with the growth opportunities that lie ahead for Aquila. With its larger asset base, earnings potential and cash flow, the combined company will have more efficient access to capital to execute its ambitious plans.

> "The merchant strategy behind Aquila's rapid growth has been a key driver behind UtiliCorp's achievement of aggressive earnings targets," Green said. "We decided that UtiliCorp shareholders would be better served by embracing the Aquila energy merchant strategy as the company's core strategy rather than spinning the business off as a separate entity. To symbolize that change in thinking, we intend to adopt "Aquila" as our corporate name after our exchange offer is completed."

> ". . . . Aquila shareholders will have the opportunity to continue to participate in Aquila's growth through their ongoing ownership of UtiliCorp shares, and to receive cash dividends as UtiliCorp shareholders," Green said.

> ". . . . UtiliCorp United is an international electric and gas company with energy customers and operations. . . . Its 80 percent-owned Aquila, Inc. subsidiary is one of the largest wholesalers of electricity and natural gas in North America. . . .

> 77.     In a document entitled "Employee Questions and Answers," filed with the SEC

on November 7, 2001, pursuant to Rule 425, the Company stated:

> Why Did UCU [UtiliCorp] Decide Not To Spin Aquila As Originally Planned?

> Recent significant changes in the merchant energy sector - Aquila's trading multiple has fallen dramatically despite earnings estimates that have increased almost 80 percent - the general economy and the impact of these changes on the capital markets were factors in this decision.

> Also of significance is the new strategic direction we see for UtiliCorp as a whole, which is based on the Aquila merchant strategy responsible for Aquila's rapid growth and UCU's achievement of aggressive earnings targets.

> Other reasons include:

- o Aquila needs a larger balance sheet and stable base of cash flow to support growth ambitions.
- o Aquila has positive growth potential.
- o The new combined corporation will be positioned to optimize operational, financial and strategic opportunities.

The UCU Board of Directors and executive management team decided that in light of current market and economic conditions, UCU shareholders would be better served by embracing the merchant strategy as core to UCU rather than spinning off the business as a separate entity.

". . . . Is There Concern That The Company May Lose Its Credibility?

No. Several other energy companies that were pursuing similar spin-off strategies with their energy merchant subsidiaries have altered or are in the process of altering these strategies.

78.     After circulating the Employee Questions and Answers filing, the Company

distributed the following:

This morning we released information to employees, the media and the financial community regarding our decision to withdraw plans to complete the Aquila spin. Our announcement falls on the heels of several other energy companies that have shelved spin-off plans, citing economic and other market changes that have made new offerings less attractive.

". . . You, too, should have confidence that our collective efforts will ensure the success of these new plans and the continuation of our reputation as a leading industry performer.

Our ability to manage a world-class delivery network and operate an aggressive risk management business—both in the United States and internationally—is reflected in an impressive 96.8 percent total return to shareholders during the past five years. We've also posted record sales, EBIT (earnings before interest and taxes) and return on equity figures during the same period. These are all strong indicators that our strategy, combined with the talent and determination of our people, ranks us in an elite class of industry performers.

". . . . The future

Our decision to change our corporate name to Aquila signifies our decision to embrace the Aquila energy merchant strategy because of its high-growth potential but our name is not nearly as important as the people who help drive this organization. . . .

79.     Soon after UtiliCorp announced its tender offer for the shares of Aquila,

individual stockholders of Aquila filed complaints in Delaware and Missouri courts purporting to

commence class action lawsuits. In general, the complaints alleged:

> (1)  breaches of fiduciary duty by UtiliCorp, Aquila and the members of the board
> of directors of Aquila in connection with the tender offer and subsequent merger;
> (2)  defendants' failure to timely appoint an independent Audit Committee
> permitted UtiliCorp to commence the tender offer at an non-negotiated and less
> than optimum price per share;
> (3)  defendants were acting to further their own interests at the expense of the
> holders of Aquila's Class A shares;
> (4)  defendants made material misstatements and omissions concerning Aquila's
> planned formation of an Audit Committee consisting of independent directors to,
> among other things, monitor transactions between UtiliCorp and Aquila.

Not alleged and not known by the individual Aquila shareholders was that the tender offer was

tantamount to a bailout of a company, Aquila, which was facing serious troubles.  On June 9,

2004, *The Associated Press* announced that Aquila settled this lawsuit for $37.95 million.

80.     On November 15, 2001, UtiliCorp made a presentation to analysts regarding the

withdrawal of its tender offer for the Aquila shares.  According to the transcript, filed with SEC

on November 16, 2001, defendant Robert Green stated, in part:

> But just to give you the sound bite up front, we believe this is a better, lower risk
> path to the same place in terms of executing the ILA strategy.  And that's the case
> we'll make here this morning.
>
> ". . . . And we think, with a recombined balance sheet, we can pursue that
> growth rate at a lower-risk profile for investors.
>
> ". . . . We think in the current environment, we can target 15-percent
> growth and deliver that at a lower-risk profile. And that's a better path for
> investors in terms of creating shareholder value in the merchants' strategy.
>
> ". . . . I think you're probably more familiar than we with the change in
> market conditions, the weakening economy and the fact that today, the equity
> markets are closed for a company like ILA [Aquila].
> And as we look at the current environment, we see a number of opportunities to
> acquire assets and an attractive value. And we believe it is important to position
> ILA to capitalize on those opportunities in the marketplace.  With capital markets

closed, many players are having to monetize assets to fund their growth. I think everybody has seen that. And we need to position ILA to capitalize on those opportunities.

". . . . Now, those are the macro events clearly in the merchant space. We've had a number of events that have a bit of a cloud over the merchant space - the California crises passing, the regulatory fallout, a perception of a capacity glut.

". . . . And the two growth engines we talk about in the IPO are performing extremely well. In the third quarter, our client service business, it's a group that provides total risk management solutions, net power cost hedges, gas cost hedges, up 60 percent. Capacity services was up 80 percent. Those are the growth engines that this recombined balance sheet will support.

". . . . Now, what's happened to this company over the last five years is a transition to growth and to opportunity, as the markets have deregulated. And you'll continue to see that transition. In terms of assets, on the recombined basis, it's 50-percent Aquila, but in terms of earnings, 62 percent. So grow that 62 percent at 25 percent growth. We've never been more confident about the Aquila business model. It's over delivered on the prospectus commitments.

81.     As part of the presentation, the Company utilized a variety of slides. Copies of the slides were filed with the SEC on November 14, 2001, pursuant to SEC Rule 425. In addition to showing the overall growth of UtiliCorp and Aquila as separate units, numerous slides included the outlook for the recombined company. One such slide indicated that for the trailing 12 months ended August 30, 2001, Aquila accounted for $524.4 million, or 60%, of UtiliCorp's EBIT. This was up from the 0%, 10%, 20%, and 35% for the 1997, 1998, 1999, and 2000 fiscal years, respectively. In addition, the slides sent an incomplete mixed message to investors with regard to uncertainties in the business environment since Aquila had been spun off, including "market conditions," "industry conditions," and "tightening credit markets." Contemporaneously, the Company presented slides suggesting that these challenges created significant opportunities for a recombined UtiliCorp/Aquila. A heading on one such slide entitled "Scale and Balance Matter Most in the New Environment" set forth that "access to

capital critical (scale and stability important)," continued high volatility provided growth opportunities and formidable merger and acquisition opportunities.

82.     The question and answer session held during the November 15, 2001 presentation echoed the growing concerns over the business practices and structural health of companies with involvement in the energy trading markets:

> Q: Bob, in the third quarter, I guess Aquila entered into a credit agreement with the parent, UCU. The letter of credit that I saw in the disclosure. And I was wondering why you did that and if that has anything to do with this tender? Are there any liquidity issues in the quarter and that - those kind of issues?

> Dan Streek: The reason why we entered into that agreement is we were in the process of setting up a stand-alone line of credit for Aquila. And the market, right now - the bank market right now, is a little choppy. So we had planned on delaying that into the early part of 2002. But, as part of the transition agreement, we just utilized the resources of UtiliCorp in that interim period.

> Q: And I guess this is along the same lines. But if you could elaborate a bit more about what the banks are concerned about. And you talked a bit about the balance sheet and the concerns in the credit markets. If you could just elaborate for us some more detail what they are, where you're at.

> Dan Streek: Well, obviously, currently, the banks are somewhat concerned about a lot of the events surrounds Enron, a lot of the headlines are on that and some other headlines around AES and Constellation. Those type events have caused a lot of questions in the market, really has depressed stock prices, which all of you, of course, know, which is basically, kind of, shut off for ILA on the equity side of the market. The tech side of the market is open but it's limited.

> And we want to grow responsibly with both - tapping both sides as we grow because credit ratings are important, even more important in today's market. And we believe a balance approach, tapping both sides of the capital market is the way to grow the company responsibly.

83.     On November 16, 2001, *The Kansas City Star* published an article concerning the UtiliCorp-Aquila tender offer entitled "UtiliCorp to Proceed With Aquila Buyback; Suits Don't Dampen Utility's Intention to Reacquire Shares," that stated, in part:

> Green noted Thursday that the [tender] offer was a premium from the closing price of Aquila's price the day before the repurchase plan was announced.

**Moreover, he said, keeping Aquila with UtiliCorp is expected to bring more shareholder value.**

**That's a sharp reversal of strategy from April, when the Aquila spinoff was seen as the best avenue to increasing value.** Aquila was engaged in fast-growing unregulated businesses such as energy trading, and UtiliCorp expected it to blossom as a separate company with a stock price that wouldn't be held back by UtiliCorp's more sedate regulated utility business.

**". . . But Green said a slowing economy and less volatile energy prices, which aren't good for trading companies, eroded the value of Aquila's stock and the stock of similar companies. Aquila's sector also was hurt by the troubles at Enron, the country's largest energy trader.**

**The decline in the stock price limited Aquila's ability to raise cash. At the same time, Green said, capital markets became more restricted, making it more difficult to get loans.**

**Green said that over the next several months there will be assets such as power plants that Aquila wants to buy**. . . **But Aquila now needs UtiliCorp's balance sheet to help it raise money to make it all possible.**

**". . . In an SEC filing Wednesday, Aquila reached out to UtiliCorp for more money. In August, UtiliCorp agreed to a $250 million revolving credit agreement with Aquila. As of Sept. 30, Aquila had tapped it for $125 million.**

84.     In a letter to UtiliCorp shareholders dated November 28, 2001, and filed with the

SEC on November 28, 2001, pursuant to SEC Rule 425, UtiliCorp stated, in relevant part:

UtiliCorp is an international, growth-oriented energy company based in Kansas City, Missouri. We operate two primary business segments: Energy Merchant and Networks.

Our energy merchant business operates primarily through Aquila, Inc., an 80 percent-owned subsidiary. Aquila is experiencing rapid growth as a leading risk manager and wholesale energy merchant. The company controls a geographically diverse asset base and transportation network, markets and trades a wide portfolio of commodities, and provides a broad array of products and services to allow clients to manage risks such as price volatility or availability of supply. The merchant strategy behind Aquila's rapid growth has been a key driver of UtiliCorp's achievement of aggressive earnings targets.

". . . Our networks business serves approximately 4 million electric and natural gas customers in Canada, Australia, New Zealand, and the United States.

In addition, we have announced the planned acquisition of Midlands Electricity in the United Kingdom, which serves an additional 2.3 million network customers. Also contained within networks is our approximate 38.5% equity interest in Quanta Services, Inc. and our U.S. broadband communications' activities.

85.     Despite its presentations to investors and Plan participants, defendants knew, or should have known, that the reacquisition of Aquila by UtiliCorp was extremely risky and would result in UtiliCorp carrying heightened financial burdens.  The reality, as defendants knew, or should have known, was that Aquila was a sinking ship that required a substantial amount of additional capital in order to remain afloat, and that the reacquisition by UtiliCorp would merely bring one more party aboard.  Yet, UtiliCorp remained an investment alternative in the Plan and defendants continued to encourage the investment in, and ownership of, UtiliCorp stock.

86.     On December 3, 2001, UtiliCorp filed a registration statement (the "2001 Registration Statement") with the SEC on Form S-4 in connection with its tender offer for Aquila shares.  The 2001 Registration Statement emphasized the Aquila's strong performance and growth, noting the 238% growth in EBIT and its 57% contribution to UtiliCorp's net income for the prior nine months.  The Registration statement also discussed the purportedly significant opportunities available to Aquila upon the recombination of UtiliCorp and Aquila, as well as each units business activities and UtiliCorp's history as a traditional energy provider.  The Registration statement assured investors that the "convergence" of unregulated and regulated energy markets would enhance opportunities for the recombined Company to distribute and sale the energy products in its portfolio of generation and natural gas assets, with an important aspect of the strategy being to expand the Company's energy generation capacity.  Furthermore, the Company stated that the recombination would provide additional financial capability that would allow the Company additional business opportunities, such as purchasing energy assets at distressed levels that Aquila, alone, would otherwise be unable to.   Moreover, the Company

detailed the purportedly extensive risk management and controls the Company had implemented to monitor risk exposure associated with its Wholesale and Capacity Services, which included Energy Merchant Services. The "Risk Management and Controls" included the monitoring of the business and value-at-risk by the Board of Directors, an independent Trading Control Officer who reported directly to the Chairman of the Board and the Board of Directors, independence of the trading functions and risk control functions, risk calculations and modeling to limit exposure and loss, and credit monitoring.

87.     On December 19, 2001, the Company made another presentation to financial analysts to promote the recombination of UtiliCorp and Aquila. Images of the slides used during the presentation and a transcript of the presentation were filed with the SEC on December 19 and 20, 2001, respectively, pursuant to Rule 425. In depicting the composition of the recombined entity, the Company used seven slides. Of the seven, five focus on the distribution network for traditional energy products, one slide depicts the composition of Aquila being Wholesale Services (commodities and risk/financing products) and Capacity Services (power generation), and one slide utilizing buzzwords related to "Alternative Risk Products."

88.     During the presentation, the Company focused on the uncertain market conditions of the energy merchant sector yet reiterated the underlying strength and health of their traditional energy producing assets. During the presentation, defendant Robert Green reiterated that, purportedly, the two companies would be strengthened through the recombination and provided additional opportunities with minimal risk exposure on the commodity trading side.

89.     During the December 19, 2001 presentation, a transcript of which was filed with the SEC on December 20, 2001, the Company also had the following discussion with analysts:

Q: A couple of questions, with respect to the rationale you provide for the recombination with respect to the balance sheet and so forth, **should I infer then**

**that one of the reasons to do that is that the new company will accelerate investment in physical assets to support the trading business** and that's where the benefit of a better balance comes in to Aquila?

Bob Green: Yeah that's one of the benefits. I think there are two primarily benefits.

We're in a once in a commodity cycle environment to pick up assets at an attractive price. There are probably more assets on the market than there are buyers if you look at the recent announcements about companies selling assets to bolster their balance sheet.

So we'd like to pick up a few assets. We think this is the right environment to buy assets at the right price to bolster our position on the energy grid to provide these risk management services. That's the Big Opportunity Number 1.

Big Opportunity Number 2 is in Client Services. And as we provide these net power cost hedges or gas cost hedges, ultimately the degree to which we can pick up market share is limited by our equity base. And we just added Aquila's $800 million equity base. We've added $3.2 billion of equity to that base to grab market share with a window of opportunity here that is rare in this marketplace.

Q: And a sort of a related question, it seems as all the merchants have been recently had a discussion with their rating agencies relative to the ratings, any updates for you guys?

Bob Green: We have had those discussions. Dan Streek was in discussion actually yesterday with the rating agencies. We keep an open, active dialogue with the rating agencies. We've taken a lot of steps this year to strengthen our balance sheet. With a 57% equity component I think we feel like the rating agencies are satisfied at this point in time. But we continue to dialogue with them and are committed to do what it takes to keep our investment grade rating.

". . . . Q: I was just wondering if you were going to be taking any reserves for some risks that you're got on the balance sheet or off balance sheet?

Bob Green: We've indicated our exposure with regard to Enron publicly at a maximum of $40 million for Aquila. And then UtiliCorp has a $31.5 million unsecured interest in a pipeline business. . . .

90.     On December 19, 2001, the stock closed at $23.88 per share.

91.     On December 21, 2001, *Fitch Ratings* ("Fitch"), an international debt and

securities ratings agency, placed UtiliCorp and four other energy companies on negative watch.

Defendants knew the importance of an investment grade rating on the Company. Defendants

also knew that deterioration in the Company's credit rating would result in significant financial

strains on the Company, if not be potentially fatal to the Company's existence. Reporting on the event, *Dow Jones Capital Markets Report* published an article that stated, in part:

> Fitch stated that access to funding sources in the bank and capital markets is less assured currently than in the past for energy companies. The companies face a weak macroeconomic environment and slower expected growth in demand for energy, it said.
>
> Also, the five companies derive a significant portion of earnings and cash flow from the merchant energy business and/or have aggressive capital expenditure programs. The companies have relatively high debt leverage for their respective rating categories, said Fitch.
>
> ". . . . A mini-panic started in the energy sector with the events surrounding the downfall of Enron Corp. (ENE), said Cartwright. The panic was "starting to fade, but was re-triggered by the Moody's downgrade" of Calpine Corp. (CPN), he added.

92.     On January 4, 2002, UtiliCorp announced that it had accepted the Aquila shares tendered as part of its repurchase of previously spun-off Aquila shares. On January 7, 2002, the UtiliCorp/Aquila short-form merger was completed, marking the recombination of the companies.

93.     On January 21, 2002, the Company issued financial guidance in a press released release entitled, "UtiliCorp Expects Record Full-Year Operating EPS of $2.44," a 17% increase over the prior year's operating earnings, wherein defendant Robert Greens stated the following:

> "We have reviewed UtiliCorp's near-term capital and operating growth plans to ensure they reflect current energy industry and capital market conditions. We also intend to issue additional common stock to enhance our already solid balance sheet."

94.     On February 7, 2002, the Company issued a press release announcing that it had operating earnings of $2.44 per diluted share for its fiscal year 2001, a 17% increase over the prior year's operating earnings and the fifth year in a row that "UtiliCorp has met or exceeded its earnings growth commitments to Wall Street." The results included an after-tax expense of approximately $40 million arising from trading and investment transactions involving Enron.

The Company also reported that it had 115.7 million shares outstanding versus 93.8 million in 2000, an increase of 23% in a single year. In the press release, defendant Robert Green commented on the results as follows:

> "Our diverse portfolio of businesses, consisting of the Merchant Group and the Global Networks Group, has again proven successful in meeting our earnings targets during a year of unprecedented market challenges. Execution and client focus were critical to our success in this environment. Our global network businesses should continue to provide stable core earnings while our merchant businesses continue providing high value-added products and services that help our clients manage their business risk. This combination gives us confidence in our ability to meet or exceed our target of 10 percent earnings growth in 2002."

95. The press release discussed operations results from the Company's various divisions. Discussing the results of the Merchant Group, the press release provided that operating EBIT from the Merchant Group increased 90% to $383.8 million in 2001, a "record performance," noted continued growth in the Wholesale Services subunit, with growth in the structured finance portfolio, significant growth in power and gas trading volumes and a 28% increase in structure transactions and new-commodity products, including various risk-hedging products. The press release also noted that the Capacity Services subunit provided stronger than expected operating results and had acquired interest in six power plants through its GPUI purchase.

**Troubles Surface at the Company**

96. Despite the positive annual earnings results, the February 7, 2002 announcement included severely disappointing fourth quarter results and would be the first of many disappointing earnings announcement from the Company. The intrinsic danger of the Company's recent activities and the threatened financial viability of the Company, which were known or should have been known to the defendants by this time, would not become apparent to Plan participants until their investments in the Plan were virtually decimated. Throughout this

time, the market would learn what defendants already knew – that Aquila's foray into the energy trading markets and its extensive use of leverage were risk-laden activities that would result in significant discounts by the market and credit agencies, which would expose Aquila to further difficulties in operating its expansive operations. While the market learned of the inherent risks associated with Aquila over time, defendants represented the Company in an overly optimistic manner, failed to completely disclose the many unwavering realities of the problems in the Company, and continued to encourage and allow Plan participants to invest in the Aquila Stock Option.

97. The fourth quarter and annual earnings for fiscal year 2001, announced on February 7, 2002, would signal the beginning of severe difficulties for the Company. *Dow Jones* published an article entitled "UtiliCorp Swings to Loss Amid Dismal Sales, Costs Related to Enron" that reported that the Company lost $6.2 million for the fourth quarter 2001, compared to a year earlier profit of $48.2 million, due to a $40 million expense related to Enron and a sales decline of 19%, to $8.64 billion from $10.61 billion a year earlier. The article further stated:

> ". . . .In December, UtiliCorp said it held two unsecured promissory notes from Enron in the aggregate amount of $31.5 million. The company also had said that Aquila's exposure to Enron was less than $40 million.
>
> ". . . . The company said its global network businesses should continue to provide stable core earnings, while its merchant businesses continue providing high value-added products and services that help clients manage business risks.

98. In the "Financial Review" section of the Company's report filed on February 25, 2002, with the SEC on Form 8-K, the Company finally began to explain the complete impact of Enron on its operations. The Company stated, in part:

Impact of Enron on the Commodity Markets

> Enron Corporation has been the dominant company in the energy commodity markets in recent years with its proprietary electronic trading

platform, EnronOnLine, processing a significant share of the trading volume in the market. When Enron's financial difficulties became public in late 2001, many companies doing business with Enron and using EnronOnLine began to look to other energy companies, including Aquila, and other trading platforms for their energy and risk management needs. Aquila experienced a 52% increase in total Btu equivalent per day volumes during the fourth quarter of 2001 over 2000. It is difficult to directly attribute this increase to the absence of Enron from the market; however, we believe a portion of the increase was Enron-related. Intercontinental Exchange (ICE), in which Aquila has a 5% ownership interest, also experienced increased activity as the markets shifted from EnronOnLine to other electronic trading platforms. Total volumes and users on ICE increased by 65% and 30%, respectively, from October to November 2001. ICE also had an increased volume of gas and power trades for next-day delivery rather than next-month delivery in response to shortened timeframes for planning. We also had an increase in the number of client transactions in the fourth quarter of 2001 compared to 2000. It is still too early to predict how transactions, volumes and earnings will be affected by the Enron bankruptcy, but overall we believe the situation has created a number of market opportunities for us.

99.     On February 27, 2002, Fitch issued a press release entitled "Fitch Ratings Downgrades UtiliCorp To 'BBB-'; Rating Outlook Stable" announcing that it was downgrading Aquila's senior unsecured debt from "'BBB' (negative outlook) to "'BBB-' (stable outlook)."  This downgraded affected $2.8 billion worth of debt. The press release explained that the downgrade was due, in part, to the Company's increasing dependence upon cash flows from the merchant energy business, high capital expenditures and a need for additional long-term debt and equity financing over the following years.

100.    Concerns over the financial condition of companies that participated in the energy trading markets continued to increase during this time period.  On February 27, 2002, *Dow Jones* published a news story entitled "Chubb Requests Collateral From Certain Surety Bond Principals," reporting that Chubb Corporation had requested collateral from Aquila to protect $570 million in surety bonds in which Aquila was a principal.  In response to the request, Aquila commenced litigation against Chubb.  The article further provided:

"Our request for collateral was a prudent action for us to take in the wake of losses and potential losses from Enron surety bonds," said Weston M. Hicks, Executive Vice President and Chief Financial Officer of Chubb . . . "We are simply acting to enhance and protect our interests by exercising rights we have under the terms of the surety bond documents."

On July 19, 2004, Aquila announced that it settled the litigation with Chubb. The settlement required Aquila to pay more than $600 million to Chubb Corp. ($485 million) and St. Paul Fire and Marine ($115 million), each of who had issued surety bonds to Aquila.

101.    The validity and integrity of accounting practices among energy companies and energy trading participants remained a growing concern. An article entitled, "UtiliCorp Leads Peers In Earnings Tied To Mtm Accounting, Survey Says," and published on March 1, 2002 by *Platt's Inside F.E.R.C.'s Gas Market Report*, a newsletter focused on the gas market detailed the growing concerns over the widespread use, and abuse, of mark-to-market accounting ("MTM") to potentially inflate earnings by accounting for the fluctuation in present values of outstanding commodity contracts. The article noted that of the 15 U.S. energy companies reviewed, Aquila derived the highest percentage of its profits over the prior year from MTM adjustments not realized in cash, or specifically, approximately 33% of UtiliCorp's 2001 earnings. The article explained that a significant amount of earnings derived from MTM accounting can send an incorrect signal to investors and that it is ripe for abuse, such as valuing commodity positions based on flawed internal pricing models rather than quoted prices, which themselves may be entirely inaccurate if the market is based on an illiquid market or  artificially liquid market. Several energy company executives were also quoted as stating that MTM accounting should be abolished and replaced. One executive noted that his company's earnings could have been increased by $400 million through MTM accounting.

102.     On March 6, 2002, *The Wall Street Journal* published an article entitled,
"UtiliCorp Hitches Future to Aquila Unit, But Investors Are Wary of Trading Sector," which
stated: "the increasing dependency on the trading business has increased the company's risk
profile . . . The new business mix will cause the company to need more cash on an ongoing basis.
That has raised eyebrows." <u>With revelations of the improprieties in the energy trading market
and the threat of imminent downgrades of Aquila's credit rating, it was clear to defendants that
Aquila was a high risk investment alternative, not suitable for Plan participants.</u> Yet, the Plan
continued to offer the Aquila Stock Option as a Plan investment option, and defendants
continued to encourage Plan participants to invest in Aquila stock.

103.     On March 15, 2002, the Company changed its legal name from UtiliCorp United
Inc. to Aquila, Inc., and on March 18, 2002, it began trading under the symbol "ILA." The
Company's stock closed that day at $24.76 per share.

104.     On March 21, 2002, the Company issued its Annual Report for fiscal year 2001
with the SEC on Form 10-K. In the accompanying "2001 Annual Report Investor
Newsmagazine," the Company continued to assure investors, despite its clear and growing
problems, that it was in sound financial condition, stating:

> The collapse of our biggest wholesale competitor in December 2001 sent far-
> reaching shock waves throughout our industry and beyond. **Our most important
> message to you is that, in spite of the economic downturn and the turmoil in
> our industry, AQUILA IS IN SOUND FINANCIAL CONDITION. As capital
> markets stabilize, our strong balance sheet provides room to maneuver.** We
> intend to capitalize on opportunities to expand operations and gain market share
> as many of our peers sell assets to pay down debt and meet credit commitments.
>
>      ". . . . **Our systems and procedures for monitoring and controlling risk
> are recognized as among the best in the business.** We apply these controls
> rigorously, both to limit the risk in our energy trading operations and to manage
> our exposure to credit risk from transactions with others.

Our fundamental strategy is to manage our risk and transfer it to the capital markets. In 2001, two-thirds of our trading days were profitable and contributed to record earnings. Our credit risk management processes have performed exceptionally well, limiting our exposure to both the California energy crisis and the collapse of Enron to a level well below that of our peers.

". . . . MERCHANT ASSETS

While we see tremendous opportunity today to expand Merchant Services' operations, we also recognize that the markets for capital and credit are tightening. We evaluate all opportunities against three criteria. Each must enhance our strategy, achieve appropriate risk-adjusted financial returns, and not diminish our overall credit rating.

**Our philosophy is to have a balanced mix of assets that complements our trading and risk management activities. Currently, Aquila owns and operates 4,721 megawatts of generation capacity . . . .**

**In 2001, Aquila Merchant Services invested $172 million to expand its generation portfolio, and with a partner it will invest $220 million in the second quarter of 2002 to acquire and develop a 12 Bcf gas storage facility in California.**

105.    On April 19, 2002, the Company issued a press release announcing that it

expected lower earnings per share for the first quarter than previously forecast.  It adjusted its

first  quarter earnings per share expectations to $0.32, down 54% from the same period in 2001

and fiscal year 2002 earnings of $2.20 to $2.30 versus earlier guidance of $2.83.  It stated:

Key factors affecting lower first-quarter 2002 results were lower prices and volatility. By contrast, higher prices and robust volatility favorably impacted Aquila's Wholesale Commodity and Domestic Networks in 2001. Also impacting results were warmer-than-normal weather and an additional 31.4 million diluted average shares outstanding in 2002 as compared to 2001, resulting from the Aquila exchange offer and equity offering earlier in the year.

". . . . "Exceptionally strong performance in last year's first quarter by our Wholesale Commodity Group combined with strong off-system sales in our Global Networks business made it difficult to show growth in this year's first quarter," [Robert] Green said. "As we continue to increase our focus on the energy merchant business, our earnings will be more dynamic and fluctuate from period to period. . . ."

**The Company's Foray Into Energy Trading Proves To Be Disastrous For Investors**

106.     On April 26, 2002, *Moody's Investors Service* ("Moody's"), a leading provider of credit ratings, research, and analysis for debt instruments and other securities, announced it had changed its outlook on Aquila to negative, citing concerns about declining earnings, in part due to Aquila's April 19, 2002, earnings warning, general sector weakness for Aquila's energy trading operaions and reduced external credit availability. The press release stated, in part:

> ". . . . **Aquila has changed its business strategy and redirected its growth plans into the energy merchant business, increasing its business and financial risk profile in a challenging market environment for energy trading companies.** While the company has issued equity over the past year, cash outlays have exceeded funds from operations. Leverage as measured by comparing debt and lease obligations to cash flow from operations has deteriorated. In addition, cash from international investments has been modest in comparison to the sizable capital employed.

107.     As a result of *Moody's* credit rating downgrade, the first of many to come, Aquila shares declined the following trading day after the downgrade to close at $17.10 per share, down $5.15, or 23%, from the previous trading day's closing price of $22.25 per share.

108.     Amid growing concerns over the financial health of companies involved in the energy trading markets, the Company continued to assure employees and investors of its financial health, issuing a press release on April 29, 2002, entitled "Aquila Reconfirms Commitment to Strong Balance Sheet and Investment Grade Rating," in response to the Moody's outlook downgrade.  The press release, describing the various steps the Company was taking to strengthen its balance sheet and liquidity, foreshadowed the severe economic problems that were on the horizon for Aquila.  The steps to strengthen the Company's financial condition included the issuance of over $1 billion in equity over the prior year (adding 36.6 million more shares outstanding), the issuance of debt, the opening of additional credit facilities, the plan to sell $500 million in "less strategic" assets and the implementation of cost-cutting and revenue-enhancing

initiatives. Despite the early cautionary signs provided by independent sources, including numerous ratings agencies, the April 29, 2002 press release acted to assure employees that the Company was not prone to further deterioration as a result of external pressures but, instead, would be able to accommodate any purported liquidity concerns through its strategic decisions and purportedly sound asset base. Like all other press releases and public communications, this press release was, upon information and belief, distributed to at least executive employees of the Company. Throughout the Class Period, the Company's communications to employees would reflect a denial of internal problems and downplay concerns raised by other market participants such as credit ratings agencies and analysts.

109. The Company continued to accentuate its large base of traditional energy producing assets and the importance of such assets. On April 30, 2002, the Company announced its intention to acquire Cogentrix Energy, a power producer, in a press release that stated, in part:

> The agreement is another example of Aquila delivering on its client-focused strategy by further extending its national generation presence and adding one of the industry's leading operating and development teams. The addition of 3,496 megawatts increases Aquila's current portfolio of 3,655 net megawatts in operation and under construction by almost 100 percent and further diversifies Aquila's portfolio by region, fuel type and technology.

110. On May 1, 2002, the Company announced earnings for the first quarter of fiscal year 2002. The Company's earnings declined 54% to $0.32 per share on revenues of $8.861 billion versus $0.69 per share on revenues of $11.98 billion for the same period the prior year. The Company stated that factors affecting the results included a mild winter, general economic decline, lower commodity prices and voliatility, a change in accounting for gas storage inventory, which would have reduced the $0.69 per share earnings in the year-earlier period by $0.16 a share, or 23%, and shareholder dilution caused by an increase of 31.4 million shares outstanding. The press release stated, in relevant part:

". . . .**Merchant Services' first quarter earnings before interest and taxes (EBIT) were down $57.9 million from the first quarter of 2001, which was one of Aquila's best quarters. Approximately $28.7 million of this variance was attributable to a change in accounting method relating to the carrying value of gas storage inventory in the Merchant Services business. The change in accounting had little impact on 2002 results. However, if applied in first quarter 2001, EBIT would have been significantly reduced**. . . .

". . . .Wholesale Services reported $28.4 million in EBIT for the first quarter 2002 compared to $62.4 million in first quarter 2001. **As stated above, approximately $28.7 million of this variance results from a change in inventory accounting.** The remaining $5.3 million variance is from lower price volatility in 2002.

". . . . Capacity Services

Capacity Services EBIT was $3.2 million compared to $27.1 million in first quarter 2001. The main factors impacting the year-over-year change were a return to an expected spark spread (conversion of natural gas to electricity) environment, lower prices and volumes in the gas gathering and processing business, and new capacity payments.

Generation plants, including the Acadia (LA), Crossroads (MS) and Raccoon Creek (IL) projects, are all on or slightly ahead of schedule . . .

" . . . . First quarter financial results from Domestic Networks were $46.1 million, or $30.9 million below first quarter 2001. **Key issues creating the shortfall were warmer-than-normal weather, off-system sales to western markets in 2001, and an increase in other operating expenses.**

111.     Also on May 1, 2002, amid the declining price of the Company's shares,

decreased revenues and the use of Arthur Andersen, an accounting firm that would later collapse

under the weight of its involvement in a myriad of accounting scandals including Enron, as the

Company's auditor, the Company announced that it would cut 500 jobs and restructure its utility

unit in an attempt to improve profitability and improve or keep its barely investment-grade credit

rating.  According to an *Associated Press* article reporting on that day's earnings conference call:

"Chief Executive Officer and President Robert K. Green and his brother, Chairman Richard C. Green Jr., tried to assure shareholders that the company, formerly known as UtiliCorp United Inc., remains a secure investment . . . Robert

> Green said Aquila has started a program to strengthen its balance sheet and improve liquidity. He also said the entire industry had to rebuild trust after Enron Corp. filed for bankruptcy. 'We're confident that as our companywide efforts to improve our credit quality take hold, the results will be noticed,' he said."

Despite the dangers and risks associated with the downfall of the energy trading market having come to fruition, and potentially greater problems should downgrades in credit ratings continue, the Aquila Stock Option remained an investment alternative of the Plan. The stock price was $16.32 per share at the close of trading on May 1, 2002.

112. On May 8, 2002, the Company issued a press release entitled "Aquila Completes Purchase of Ownership Interest in Midlands Electricity ("Midlands"), announcing that Aquila had effectively purchased 80% of the value of Avon Energy Partners Holding Company, the holding company for Midlands, the fourth-largest regional electricity company in the United Kingdom, for $264 million. Aquila would operate Midlands as "Aquila Networks UK."

113. On May 15, 2002, *Dow Jones* published an article entitled "More Than A Dozen Energy Firms Face Credit Risk, S&P Says." The article reported on an S&P report that found of the more than 1,000 companies it reviews, 23 of them, including Aquila and 13 other companies involved in the merchant energy sector, faced possible "credit cliff," or a sharp credit deterioration that compromises a business by, among other things, damaging its liquidity by triggering changes in lending provisions and access to credit. The article attributed Bern Fleming, manager of a utilities portfolio at American Express Financial Advisors, as stating:

> "**Credit ratings have to be taken seriously because power trading and marketing firms have to have plenty of collateral on hand**[.] If I can't put a fence around the uncertainties, it tends to cool me off. . . . **If you have a company (with a rating) in the triple-B range, then you worry what happens if there's a downgrade.**"

> ". . . . **Although he said he couldn't imagine being more cautious than he is already, Fleming said such liquidity concerns are likely to figure in his future investment decisions.**

114.     The same day, *Reuters* published an article entitled "S&P says at least 23 firms at debt triggers' mercy" stating that an S&P analysis found that 23 companies, including Aquila, faced a potential liquidity crises due to debt triggers in their borrowing agreements, whereby a debt covenant requires a need for heightened collateral when the debtor corporation's credit rating falls below investment grade.  The article stated that despite energy companies having a bigger portion of triggers because of the use of off-balance-sheet financing, few investors were aware of such triggers and many company did not routinely disclose them.  In its report, S&P stated that a "credit cliff," or "the downward spiral in credit quality set off when a company has to post collateral or pay back debt after it trips a trigger" was its biggest concern.

115.     Amid growing allegations and acknowledgments of extensive use of "wash trades" in energy, broadband and other "new" commodity markets, *Gas Daily* published an article entitled "Aquila Says 'Wash' Trading Not Widespread" on May 15, 2002, wherein Aquila denied that it had engaged in wash trades.  The article quoted Edward Mills ("Mills"), President and Chief Operating Officer of Aquila Merchant Services, as stating that wash trades were "not a widespread phenomenon across counterparties we do business with" and that Aquila had "participated in no wrongdoing in the markets we are involved in."  Mills further stated, "When you don't follow the rules in this industry, you are immediately redressed."

116.     On May 17, 2002, *New York Times* published an article entitled "Energy Trades Echoed In Broadband Market" reporting on the widespread manipulative practice of wash-trades that pervaded the broadband capacity  trading market.  The article quotes J.P. Morgan Securities analyst Anatol Feygin, as stating that it was well known within the industry that a handful of companies, including Aquila, El Paso Energy Partners, Enron and Reliant Resourse were utilizing a significant amount of wash-trades, in this instance trading back and forth of the same

broadband routes, among themselves in an effort to increase trading volumes to create a façade that the broadband trading market appear to be a more liquid and viable market than was really the case. The article cited internal pressures within companies to trade simply to inflate volumes, the lethargic trading volumes without the wash-trades and that participants would often meet for lunch to discuss trading. So well known was the scheme that companies who were solicited to become involved in the market but did not do so, referred to the broadband trading market as "DS3 Bingo." A chart accompanying this article depicted 5 alleged "wash trades" between Aquila and Reliant Resources.

117.    On the same day, the Company issued a press release, entitled "Aquila Says New York Times Article Inaccurate," denying the allegations made by the *New York Times, supra*, at ¶116. The Company stated that the trades identified in the article were not round-trip trades.

118.    The price of Aquila common stock closed at $14.37 per share on May 17, 2002, a 60% decline over the prior 12 months. An article published on May 18, 2002, by *The Kansas City Star* entitled "Aquila Denies Trading Allegations; Stock Hits 11-year Low," discussed the ongoing allegations and disclosures regarding wash trades in both broadband and energy trading, as well as the credit ratings of Aquila. The article noted that reports of manipulative trading practices, including CMS Energy Corporation's admission that it booked $4.4 billion in sham electricity sales in 2000 and 2001, had weighed heavily on firms involved in energy trading, and that Aquila had become under pressure as the result of a potential liquidity crisis and the recent spate of downgrades by corporate credit ratings agencies.

119.    By this time, defendants were well aware of the continued problems facing the Company. The market had made it clear that those involved in the energy trading markets faced severe liquidity problems given the continued reduction of their corporate credit ratings and

significant need for capital to sustain their current, and past, energy market trading activities. Moreover, defendants knew that the energy trading markets were not what they seemed, but instead were built through extensive manipulative practices, and that the viability of continued activity, revenue and profit from such a source was extremely limited, if unlikely.  <u>As fiduciaries to the Plan, defendants had a clear duty to remove Aquila stock as an investment alternative in the Plan and force the Plan to sell its investment in Aquila stock.  At a minimum, defendants had a duty to inform Plan participants of the significant risks that they faced in continued to hold Aquila stock, particularly as a large portion of their retirement investment.  Defendants, however, took none of these measures.  Instead, they continued to encourage employees to hold Aquila stock in the ways outlined above, and they continued to defend Aquila's practices and business model.</u>

120.    On May 20, 2002, the Company issued a press release entitled "Aquila Concludes Review of Trading Activity, Finds No Improper Transactions," that continued to assuage investors and boost investor confidence.  The Company announced that in cooperating with the Federal Energy Regulatory Commission's ("FERC") investigation of the California power markets, Aquila had reviewed its energy trades from 1999 through 2001, and found no "round trip" energy trades and that "none of its trades were done to inflate revenues or trading volume." The Company acknowledged that about $475 million in trades could be "misconstrued" as round-trip trades, but claimed they involved legitimate business practices such as buy-sell transactions to determine prices.

121.    On May 20, 2002, *Moody's* again placed Aquila under review for possible downgrade.  The rational was the same as that provided to justify the April 26, 2002, negative outlook announcement, with the addition of the following:

The focus of the review will include the following: changes in business risk as the proportion of unregulated operations increases, the quality of earnings from trading operations, prospective cash flow, returns and cash realizations from international investments. . . .

122.     In response to the markets' increased concerns that Aquila faced a "credit cliff," the Company stated, on May 20, 2002, that a debt downgrade to "junk" status, as threatened by *Moody's*, would trigger $179 million debt payment and require an additional $25 million to cover its trading business.  Defendant Robert Green stated that he was "very confident" that the Company could meet its obligations but declined to comment on whether a downgrade was likely or not.  The Company's estimate of $179 million would prove incorrect and inadequate. After two "corrections," the true amount would later be revealed to be $487 million in an August 14, 2002 filing with the SEC.  On May 22, 2002, the Company issued a press release assuring employees and investors that it was prepared to address credit ratings agency's concerns and reiterated the financial health of the Company.  The May 22, 2002 press release, stated in part:

"The push to improve the company's credit rating to BBB+/Baa1 is a major focus for Aquila and was initiated late last year and is identified as Project BBB+/Baa1. "While our credit metrics are the strongest in the company's history and among the best in the industry, we clearly understand credit agencies have raised the threshold," said [Robert] Green. "We've already identified $100 million in costs and will identify more, as well as sell at least $500 million in non-core, non-strategic assets."

Like other statements issued by the Company throughout the Class Period, the Company continued to deny the significance of the financial problems facing the Company,  the impact of a deteriorating credit rating and downplayed any concerns the marketplace had regarding the Company's financial position.  Rather, the Company's communications had the effect of allaying any concerns that employees may have over maintaining, or adding to, their investments in the Company's stock.

123.    On May 21, 2002, the Company announced that it would lay off 200 more employees and expand its efforts to avoid its credit rating from being downgraded to "junk." A May 22, 2002, article published by *The Kansas City Star*, entitled "Aquila Strives to Prevent Credit Rating from Sinking to Junk Status," summarized the Company's efforts, which included an additional 150 more employees eliminated in the Aquila Merchant Serivce unit, the sale of $1 billion in assets, an increase of $450 million above the amount previously announced. Defendant Robert Green is attributed as saying asset sales of $300 million were necessary to keep Aquila's credit rating from sliding. Furthermore, it was reported that the Company dropped Arthur Anderson as its auditor, yet retained the individual auditors who now worked for KPMG LLP.

124.    On May 22, 2002, FERC announced it was widening its investigation into energy trading practices. Reporting on the announcement, *The Oil Daily* published an article on May 22, 2002, entitled "Federal Regulators Widen Probe Into Sham Energy Trading," that stated that federal regulators investigating whether sham trading, such as "round trip" trades, allowed energy companies to artificially inflate the price of energy in certain parts of the United States by submission of false trade data to publications used in determining the price of energy. had ordered 150 energy companies to disclose whether they engaged in phony trades to inflate their revenues. The article noted that in response to earlier FERC requests into manipulative trading practices affecting the price of energy in California, several companies had acknowledged that they engaged in phony trades, including Aquila, which had stated that their wash trading was very limited and did not affect revenue. The article further stated that the SEC was conducting its own investigation into the phony energy trading. Describing the manipulation, the article states:

> ". . . . For example, if two companies agree to buy and sell at gradually escalating prices, they could create the impression that the market was headed up.

The two hypothetical companies would not make money on the wash trades themselves, since they would be buying back the energy at the same price. However, they could then sell power to other buyers at a higher price if they succeeded in driving up the market.

125.     On May 24, 2002, the Company issued a press release entitled "Aquila Responds to News Reports About California 'Ricochet' Power Trades," responding to allegations that it had participated and encouraged improper trading practices, that stated, in relevant part:

> The Aquila Merchant Services subsidiary of Aquila, Inc. issued a response to news reports discussing so-called "ricochet" trading of electricity in the California power market in 2000. Officials of Oregon-based PacifiCorp are said to have named Aquila as one of four companies that initiated transactions in which PacifiCorp served as an intermediary between July and November 2000, but Aquila disputes the implication that any of its activities were "ricochet" trades.

> "We have reviewed our trading records for that period and have not found trades fitting that description," said Ed Mills, Aquila Merchant's president and chief operating officer. . .

126.     On May 27, 2002, *The Wall Street Journal* published an article entitled, "Companies: In Filing, Utilities Point To Suspicious Trades --- Two Firms Fear They Aided Laundering Effort," that stated, in part:

> Megawatt laundering, also known as ricochet trading, is a practice described in Enron memos, in which power in California was bought at capped prices, moved out of the state, and then resold to California at higher uncapped rates.

> ". . . . In its filing, PacifiCorp with 1.5 million customers in six Western states, identified about 767 transactions in July through mid-November 2000 in which it would accept power from a customer in California, only to return it then shortly afterward for a small fee. . . .

> ". . . . **In addition to Enron, PacifiCorp named as participants in these back-and-forth transactions Aquila Inc. of Kansas City, Missouri**. . . .

127.     On May 30, 2002, citing "customer concerns due to heightened challenges for the merchant business model, continued scrutiny of the entire industry by credit ratings agencies, a gloomier outlook for spark spreads and mounting legal and regulatory risks," Salomon Smith

Barney lowered its rating on Aquila common stock to "underperform/speculative risk." Aquila stock closed at $12.38 per share on May 30, 2002.

128. In an effort to refocus market attention on its traditional energy producing assets, the Company issued a press release on May 31, 2002, entitled "Aquila Expects 70 Percent of 2002 Operating Earnings to Come From Regulated Utilities and Contract Power Sales, Reconfirms Commitment to Its Common Dividend," that stated, in part:

> "More recently we've become known for our trading expertise in the merchant energy sector," said Robert K. Green, Aquila's president and chief executive officer, "but our roots run deep in the regulated utility networks business, where this company has 85 years of experience. During this period of turmoil in the merchant sector, investors need to keep in mind that we expect about 70 percent of our operating earnings before interest and taxes this year to come from our asset-based businesses like domestic and international utility operations and contracted generation sales."

129. On June 3, 2002, *Dow Jones Energy Service* issued a press release entitled "SEC Official Criticized Power Traders' Acctg -Aquila CEO", wherein SEC Chief Accountant Robert Herdman is attributed with stating that energy merchant trading companies overreported trading revenue, had too much discretion over how their energy contracts are valued and lacked standard ways of quantifying risk. The article also attributed Herdman as saying that the merchant energy industry's quality of disclosure was "bad" and that the energy trading market was really only understood by those in the industry. Noting that serious questions had arisen with regard to the legitimacy of the energy trading markets and the quality of participants' financial reports, especially with regard to the use of MTM accounting, the article stated that the fallout was undermining companies' access to capital markets and ability to maintain cash flow, raising serious concerns whether such companies could warrant an investment-grade rating.

130. On June 12, 2002, S&P announced that it would start requiring merchant energy companies to submit far more information on their trading positions than previously required. It

noted that it had previously used a single, total value-at-risk number to assess the market risk borne by energy traders, but that the approach failed. A total value-at-risk number was published by the Company in its annual financial reports as its primary data point on presenting risk.

131. On June 13, 2002, the Company received an "informal data request" from the SEC regarding the Company's trading activities. On this news, the Company's stock fell $1.75, or 14%, from the previous day's close, to close at $10.50 per share.

132. On June 17, 2002, the Company again reduced its expected 2002 operating earnings to a range of $1.30 to $1.40 per share from the previous warning of $2.20 to $2.30. The Company now expected the earnings from its "commodity and origination business" to fall in between $26 million and $55 million for 2002 versus $202 million in 2001 and the projections made at the beginning of 2002 as a result of it reducing its wholesale energy services operations and reducing its value at risk to less than $5 million from $15 million. The same day, the Company announced a "strategic and financial repositioning," which was a "three-part plan" that included a reduction in its wholesale energy services business, a reduction in the annual common dividend from $1.20 per share to $0.70 per share, and the issuance of $900 million in new equity and debt securities. This would purportedly satisfy the Company's liquidity needs for 2002.

133. In a June 17, 2002, *Dow Jones* article entitled "Aquila CEO: Move From Heavy Energy Trading 'Permanent'," defendant Robert Green stated that he believed the Company was essentially out of the merchant trading business permanently and would look for smaller but safer growth of 5% a year based on earnings from regulated assets, of which it had 38 power plants and more than 7,000 megawatts of generating capacity. Consequently, Aquila's entire energy marketing and trading staff would be cut. Of the energy trading that would continue, the Company stated that it would be more asset-based trading and a focus on managing the dispatch

of power from its generating assets.  In a teleconference with analysts and investors on June 18, 2002, in which the Company announced it was pulling out of energy trading in the U.K. and Europe, defendant Robert Green stated that Aquila would focus more on originating transactions based on its physical assets than on pure trading, in part due to its lower risk profile.  It is this more conservative approach of utilizing trading mechanisms merely as a support mechanism for traditional energy assets that the Company had continually conveyed to Plan participants.

134.    In a June 24, 2002, article entitled "Aquila 'Virtually Turns Off' Its Trading Activity, Lays Off 400 In Merchant Unit," *Power Markets Week* summarized Aquila's reversal of fortunes and discussed how their reversal was destined  by the Company's new business composition, particularly since the Enron fallout:

> In the newest stunning development in an industry where such events are becoming familiar, Aquila last week shed its merchant identity entirely and pulled back close to the asset-based operation that it had been before plunging with gusto into the energy trading arena several years ago.
>
> The company is eliminating ``broad-based marketing activity, where we create a market and have the capability to deliver gas or power within an hour across North America,'' CEO Robert Green said on a conference call with analysts. . . .
>
> ``That is an activity that is virtually being turned off. We'll continue with a smaller origination activity focused on our assets. Clearly for that broader-based strategy to be executed it needs a larger balance sheet in today's environment,'' Green said.
>
> ". . . . **Wholesale gas and power activities will be limited to trading around Aquila's assets and the assets of its customers**, the firm said. Earnings from the trading business are expected to total no more than 5% of its total earnings this year, and only 2% next year. . . .
>
> ". . . . Aquila had reiterated dividend support as recently as May 31 and pledged to "increase our focus on the energy merchant business." Now, without a buyer or partner, trading and risk management will be memories within months and asset-based sales, including the capacity from Aquila's planned $1.5-billion acquisition of Cogentrix, will be all that is left.

". . . . Aquila called the Enron fallout a business opportunity, and touted its new kaleidoscope logo as representing an ``endless array of solutions.'' Rick Green said March 18, ``Aquila has successfully managed through change for nearly two decades and has emerged a far stronger competitor (that will) help customers and clients use change as a positive catalyst for growth.'' He reiterated his November assertion that trading and new-wave solutions were the future while asset-based operations with constrained profit possibilities were the past.

**But Aquila's magic was gone. It retrenched in unprecedented ways, with public assurances that the worst was over at first lasting months, then weeks, then days and even hours.** Now $1-billion in assets are for sale including the New Zealand operations.

**It is struggling to maintain investment grade ratings**, a key reason it dumped trading, and to keep its stock above $10. . . .

For all of 2001, the Merchant unit saw revenues, recorded on a gross basis, of $36-billion, while total revenues for Aquila, which includes regulated utilities in 7 states as well as Australia, New Zealand, Canada and the U.K., was a total of $40.4-billion. Even with the lion's share of revenues, Merchants' share of total EBIT was only roughly half.

". . . . Salomon Smith Barney analyst Raymond Niles cited **the likelihood of a credit downgrade for Aquila** as a reason to maintain an "under-perform, speculative risk" rating on the company. "**It is in our view at greater risk than its peers of having to sell valuable assets**, given that buyers for their relatively under-performing international assets are likely scarce or only willing to pay reduced prices," he said. "**Given the execution risk with regard to financing and asset sales, we think it is likely that Aquila's senior unsecured debt will be downgraded by either Moody's or S&P.**"

Niles said such a ratings downgrade, combined "with declining cash flows and increasing cash needs, could serve to create a downward liquidity spiral. While we do not think that this is the most likely outcome, we believe it to be prudent to remain conservative with regard to liquidity analysis at this time."

135.     On June 27, 2002, the Company announced it had raised $281.3 million in a common stock offering.  Aquila's common stock closed at $7.66 per share, a 14 year low.  On June 28, 2002, Aquila announced an issuance of $500 million of 10.875% senior unsecured notes, an interest rate approximately 6% points over Treasuries, a steep price for Aquila and another indication of the market's perspective on the risk of Aquila.

136.    In a June 29, 2002 investment column entitled "A Risky Play in World of Dividends," published in *The Globe and Mail*, a Toronto-based national newspaper, columnist Rob Carrick stated that "conservative investors should dismiss Aquila out of hand" given its risks characterization and that Aquila common stock should be considered a "speculative play."

137.    On July 2, 2002, Aquila issued a press release confirming its earnings estimate of $1.30-$1.40 per share for the fiscal year 2002 and disclosing that it expected a downgrade in Quanta, a significant investment of Aquila's, would impact 2002 results by approximately $0.05.

138.    On July 7, 2002, *The Kansas City Star* published an article entitled "Bonuses for Aquila Executives Raise Eyebrows," which discussed the eye-opening salaries and bonuses received by defendants, despite the substantial decline in the Company's stock price and declining prospects for the Company:

> In early February, as trouble brewed around the prized Aquila energy trading operation, three members of the parent company's board of directors gathered to discuss executive compensation.
>
> Fellow energy trader Enron Corp. already had stumbled into bankruptcy in a cloud of accounting scandals. A spinoff of the Aquila trading unit, once the centerpiece of plans to enrich shareholders, had been dropped. And the parent company's stock price had fallen from a high of $37.55 in May to $23.53 on Feb. 1.
>
> Even so, the board's compensation committee, citing rapid growth the previous year, decided that the company's top executives deserved hefty bonuses that went beyond the established salary and incentive packages.
>
> The compensation committee decided that nearly $6 million in salary and bonuses destined for chairman Richard Green Jr. was insufficient because of his work in cultivating the trading operation. As a result, the committee put an additional $4.5 million in "discretionary" cash and stock into his paycheck in "recognition of his contribution," pushing his total compensation to more than $10.3 million.
>
> Robert Green, president and chief executive officer, received more than $9.4 million in salary and bonuses. Nearly half of it, $4.5 million in cash and stock, came his way because the compensation committee thought he also deserved something extra.

Three other executives received a total of $12 million in bonuses on top of their salaries, most tied to existing incentive packages. **All told, bonuses for the five executives, including the Green brothers, totaled roughly $30 million, not counting stock options.**

**The bonuses were paid in March. A month later, Aquila Inc., formerly known as UtiliCorp United Inc., announced that it would fire 500 employees, a move to save about $35 million a year.** That was soon followed by additional layoffs and the announcement of a cut in dividends for shareholders and of asset sales to further conserve cash.

Aquila's stock price is now at historic lows. The company is fighting to keep its investment-grade credit rating. And Aquila is winding down most of its once high-growth trading operation and laying off hundreds more employees in the process.

". . . . Employees, who own 14.4 million shares, or 10.4 percent of the company, have lost nearly $400 million in the past year.

139.    Aquila's top executives were among the highest paid of 13 other companies in the same business sector examined in the article, including those with higher revenues, profits and better performance. Ed Mills and Keith Stamm, top executives at Aquila's energy trading unit, were paid $5.7 million and $4.8 million including salary and bonus (each received a $4.3 million bonus), respectively, versus $5 million paid to the chairman, president and CEO of Duke Energy Corp., a company with higher revenues and profits.  Dan Streek, Aquila's chief financial officer ("CFO"), received a $1.5 million bonus for 2001. Although the Company justified the salaries based on 2001 financial performance, the article noted that signs of difficulty and slowdown in the trading operations were known from at least the middle of 2001, when it became apparent that Aquila could not survive as a standalone company and needed UtiliCorp's balance sheet. For the three years ended December 31, 2001, Richard Green's compensation totaled more than $21 million.  By the time the bonuses were issued, the stock had declined 80% from its high.

140.     On July 17, 2002, *The Kansas City Star* published an article entitled "Aquila Goes Ahead With Plans To Raise Money to Pay for Bonuses" which reported that the Company planned to issue up to 11.6 million shares of stock to be used for executive and employee bonuses. 2.6 million of those shares were to cover a portion of the 2001 incentive plan for executives that had come under staunch criticism from Aquila employees, stockholders and the press. The Plan's voting interest in Aquila would once again be diluted by defendants' desperate actions.

141.     On July 26, 2002, the Company's stock closed at $5.15 per share.

142.     On August 5, 2002, the Company and Cogentrix announced they had agreed to terminate their acquisition pact announced April 30, 2002.

143.     On August 6, 2002, the Company announced it intended to exit the wholesale energy marketing and trading businesses operated by its Aquila Merchant Services by the end of the third quarter of 2002. An article published in *Platts Power Markets Week* on August 12, 2002, entitled "Aquila Reports Massive 2Q2002 Loss, Closes Door On Energy Trading Unit," described the changes at Aquila as "a dizzying demise. In rapid succession, UtiliCorp United became Aquila to reflect the dominance of energy marketing in its overall business strategy. Then it announced plans to focus more on asset-based marketing as credit worries grew."

144.     On August 7, 2002, Aquila announced that it was selling its stake in Aquila Sterling Limited ("ASL"), the holding company for Midlands Electricity PLC, which operated as Aquila Networks in the U.K. After an initial deal failed in September 2003, Aquila completed the sale for $66.5 million on January 16, 2004. Given Aquila's 79.9% stake in ASL, this amounted to $53.13 million dollars; substantially less than its initial investment of $264 million.

145.    On August 8, 2002, the Company reported a $5.69 per share loss for the first half of 2002, compared to a $1.93 per share profit in the first half of 2001.  The Company lowered its full-year earnings guidance citing lower power prices and reduced liquidity in the energy market "as players have exited."  The Company recorded $966.4 million in "non-recurring" charges, consisting of a $692.9 million non-cash impairment of its investment in Quanta Services due to the dramatic decline in the value of the common stock of Quanta Services, a $178.6 million non-cash impairment in goodwill in the Wholesale Services division, restructuring charges of $71.8 million related to Aquila's scaling back of its wholesale energy trading business and restructuring of its domestic regulated business, and a non-cash impairment of communications investments due to their failure to achieve certain operating goals, continued losses and depletion of capital.  This resulted in total non-recurring charges of $966.4 million.  The press release further stated, in relevant part:

> "This year's second quarter was a very difficult one," said Robert K. Green, Aquila's president and chief executive officer. "**The actions we have taken recently -- such as exiting the wholesale energy trading business, reducing the dividend and writing down certain asset values -- were painful but necessary steps as we transition back to our roots as an operator of network and generation assets.**"
>
> ". . . . Merchant Services
> Merchant Services' second quarter loss before interest and taxes was down $440.5 million compared to the same period of 2001.  Approximately $341.3 million of this variance relates to non-recurring items that are discussed separately. . . .
>
> ". . . . Global Networks Group
> Second quarter EBIT for Global Networks was a loss of $673.7 million, down $725.7 million compared to the second quarter of 2001.  One-time charges (discussed later) accounted for $735.9 million of the variance. . . .
>
> ". . . . Goodwill Impairment Charge
> On June 17, 2002, Aquila began to scale back its wholesale energy trading business resulting in the impairment of the goodwill associated with that business.  **Accordingly, the company wrote off the goodwill balance allocated to**

**Wholesale Services that had been generated when Aquila Merchant Services was recombined with the parent company in January 2002.**

146.     On August 8, 2002, the Company held a conference as part of the earnings announcement, during which the Company reiterated that it was exiting the energy trading market by the end of the third quarter, that the balance of its trading business would continue to decline, with the remaining transactions being derived from marketing assets the Company owned and controlled.  The Company acknowledged a potential for further impairment charges in its trading book as it continued to liquidate its energy trading positions and stated that the Company would have to post $238 million of collateral if the Company's credit rating was downgraded to below investment-grade by one agency.  Defendant Robert Green also stated:

> **Now as a result of exiting trading, Aquila has significantly changed this business model to an integrated utility model consisting of a portfolio of regulated utilities and unregulated generation. As we have said before, we believe this substantially lowers our risk profile and enhances the predict ability of earnings.**

147.     Despite the poor financial results, even among some of Aquila's traditional energy assets it was pinning its future on, the Company stated that it would still give $26 million in retention bonuses to some executives and employees at its energy trading operation.

148.     On August 14, 2002, *The Kansas City Star* published an article entitled "Aquila Battle to Preserve Surety Bonds Raises New Questions About Its Financial Reorganization," reporting on the dispute concerning surety bonds issued to Aquila by Chubb.  Surety bonds were posted by Chubb to assure Aquila customers that Aquila would perform its obligations under contracts where municipalities pre-paid for natural gas that Aquila was bound to deliver in the future.  The dispute with Chubb raised questions among the investment community regarding the viability of Aquila's financial reorganization   The article stated, in part:

".  . . Some observers also are worried that a credit downgrade, which Aquila is currently trying to prevent, would cause more problems for the gas contracts.

". . . . **Any defaults on the gas contracts, or a credit downgrade, would put pressure on Aquila and its liquidity. It is currently laying off employees, winding down its energy trading operations, selling assets and terminating deals such as the purchase of Cogentrix Energy Inc. to improve liquidity, which the company last week said would amount to about $750 million by the end of the year.**

There is a need for such a nest egg. **Aquila is already facing rating triggers in debt agreements and other deals if Moody's Investors Service and Standard & Poor's downgrade the company's debt to junk.**

". . . . It was understood, Mock said, that Aquila was free to use the money [from pre-paid gas contracts] as it decided. . . .

The problem for Aquila, say two managers within the company, is the performance of investments that the company made with at least some of the cash. The managers asked not to be identified.   One such investment, Quanta Services Inc., has sharply declined in value. . . . Quanta stock has lost more than 90 percent of its value in the last year.

149.    Despite the negative earnings reports, massive asset sales, and the exit from the energy trading business, the severity of a potential "credit cliff" for Aquila was still being under-reported by defendants and the Aquila Stock Option remained a Plan investment option.  On August 14, 2002, the Company certified numerous financial reports it previously filed with the SEC, pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, but not before surreptitiously amending information contained in some of the prior reports.  With the passage of the Sarbanes-Oxley Act, corporate executives were now forced to take personal responsibility for the accuracy of the documents that were filed by a corporation with the SEC.  It is telling that the Company, and the Green defendants, caused significant amendments to be made to previously filed document with the SEC only after it Sarbanes-Oxley made clear that they would be personally responsible for the accuracy of such filings, at the risk of personal civil and criminal penalties.

150.     Reporting on Aquila's alterations to its previously filed reports, *The Kansas City Star*, on August 15, 2002, published an article entitled "Aquila Documents Point to More Serious Loss."  Therein, it was reported that among the additional information disclosed in the updated SEC reports was that a credit downgrade, to below investment grade, would cost the Company $487 million, including $135 million in additional collateral for its trading unit.  This was significantly greater than the $335 million figure the Company had reported to analysts during a conference call held the previous week and the $25 million figure for additional collateral for its trading unit stated during a conference call held earlier in the year.  Moreover, Aquila acknowledged that a credit downgrade would have a more adverse effect on the Company after the immediate 60 to 90 days which would thereafter put significant pressure on its asset sales program.  Furthermore, the Company disclosed that it had "inadvertently" omitted in a proxy statement filed in March, 2002, that Keith Stamm and Ed Mills had received additional bonuses of $400,000 and $250,000, respectively, in 2001 for "their successful execution of growth initiatives" and that the Company would suffer a "material adverse impact" if Chubb Corp. prevailed in its legal dispute with Aquila.  The Company also revealed that it had borrowed heavily against a bank line of credit to raise $400 million in cash, which, according to an analyst, indicated that Aquila was preparing for further downgrades of its credit ratings and that the Company had cut, by almost half, the amount of cash flow generated by operations in 2001, due in part to re-characterizing the $110.8 million gain it made from selling stock in the Aquila spin-off.

151.     The stock dropped $2.55 per share, or 52%, when the market learned of the amendments, and closed at $2.40 per share on August 15, 2004.

152.     An article published by *The Kansas City Star* on August 16, 2002, entitled "Aquila Stock Loses More Than Half Its Value," stated that market participants were surprised by the

Company's amendments to its previously filed SEC documents since the Company had previously issued a press release stating that it submitted its certifications "without modification."

153.    Citing "unsettling" disclosures in the August 14, 2002 SEC filing that could trigger a "ratings action," Banc of America cut Aquila's stock rating on August 16, 2002.  The downgrade was based, in part, upon Aquila's accessing $400 million of a $650 million revolving credit line, just **a week** after implying that "current liquidity was OK and there was no need for such action," and the increase in the amount of liquidity needed should a credit downgrade occur.

154.    On August 18, 2002, *The Associated Press* reported that defendants Richard Green and Robert Green had been sued by a cousin over the handling of a family trust whose assets consisted entirely of Aquila stock.  See Green v. Richard C. Green, et al, No. 02-CV-222687 (Mo. Cir. Ct. filed Aug. 15, 2002).  The matter was scheduled for a jury trial on August 9, 2004, and no disposition had occurred as of September 20, 2004.

155.    On September 3, 2002, *Moody's* lowered Aquila's subordinated debt rating from Baa2 to Ba2, a non-investment grade rating, or "junk" status, and provided the following basis:

> The rating downgrades reflect Moody's view that poor returns from investments outside the regulated utility business in the U.S. have resulted in a significant deterioration of operating cash flows. These investments, financed almost exclusively with a high level of debt, include international utilities, a telecommunications and utility-related construction company, communications technology, five long term gas delivery contracts, merchant energy wholesale services and non-related investments. The poor performance of some of these investments resulted in impairment charges of $895 million and restructuring charges of $71.8 million for the financial period ended June 30, 2002. Market conditions and the results of the company's business segments have forced it to sell assets to meet liquidity pressures. . . .

> The Ba2 rating incorporates the execution risk associated with completion of the asset sales as the company transitions from a diversified merchant energy company into a mostly regulated utility company with some unregulated generation assets. The new rating also considers the on-going cash impact of gas pre-pay agreements, which will be a substantial drain on cash flow over the next several years. With about 95% of projected future earnings coming from regulated

assets, the restructured Aquila generates cash from operations which supports its capital spending and dividends, but leaves little cash flow to service debt. In short, the asset sales expected in the near term do not generate enough proceeds to appropriately capitalize the company at the former rating level.

156. As reported in a *Reuters* article published the same day, entitled "Aquila Falls 4 Percent On *Moody's* Debt Rating Cut," effects of the downgrade included possible forced selling of Aquila debt as certain accounts could not hold the now-junk Aquila debt, the triggering of bond repayments and increased collateral costs of approximately $192 million. A ratings reduction to "junk" by Standard & Poor's would result in additional payments of $292 million.

157. Aquila responded to the *Moody's* downgrade by issuing a press release entitled, "Aquila Positioned to Withstand Potential Effects of Moody's Action" that stated the Company had been preparing to operate under the scenario of having a junk-rating and that it was continuing to focus on its asset sale program and the exiting of the wholesale energy marketing and trading business. The Company reiterated the measures it was taking to stabilize its credit rating, including the sale of over $1 billion in assets, the termination of the Cogentrix acquisition, the 42% reduction in its dividend and cost reductions that would save over $100 million.

158. Given the energy market's environment, Aquila continued to experience difficulty with its planned sale of assets, as analysts had predicted months prior. A September 25, 2002, *Reuters* article stated that Aquila faced a loss of over $100 million from the sale of its Midlands Electricity stake, in part due to overpaying for the stake, and that the sale would likely contribute only a few tens of millions of dollars toward Aquila's planned sale of $1 billion of assets.

159. On October 1, 2002, the Company announced that defendant Robert Green, CEO of Aquila for less than a year, would resign from all executive officer positions with the Company and from its Board. Despite the financial state of Aquila and the significant decline in its market capitalization, the Company provided separation compensation of approximately $7.6

million, inclusive of compensation for the 18 month period that Robert Green would continue to provide services to the Company, and in addition to the $8 million bonus he received earlier in the year.

160.    On October 19, 2002, the Company announced that Dan Streek would resign as the Company's CFO.  Streek was appointed CFO in August, 2001, having come from Arthur Andersen.  Reporting on the resignation, *The Kansas City Star* stated that Streek faced criticism as a result of the Company's upward revisions in the amount of cash that would be required should its credit rating be rated junk as well as the revision of the Company's 2001 financial results, which cut in half the cash from its business operations.

161.    On November 2, 2002, *The Kansas City Star* published an article entitled "Federal Investigators Ask Aquila for Data on Energy Price Indexes,"  reporting on inquiries made to Aquila, one of the top five energy traders before exiting trading, and other energy trading companies, in relation to FERC's investigation of manipulation of electricity and natural gas price indexes.  Price indexes are used by gas utilities to calculate the cost of wholesale gas and affect what consumers must pay for their utility service.  Price indexes are published by several companies who are provided price quotes of gas traded by buyers and sellers.  In an August, 2002, report, FERC noted that market participants had incentives to provide false information to publishers of price indexes, and concluded that it could not rely on price indexes because they are "susceptible to manipulation and cannot be independently validated."

162.    On November 13, 2002, the Company reported a loss of $331.6 million, or $1.85 per share, which included $155.8 million of non-recurring charges, for the third quarter of 2002 and announced that the Company "**suspended the quarterly cash dividend**" after a detailed analysis of the Company's financial condition.  The Company stated that it was largely finished

exiting the trading business and was focusing on restructuring or terminating its existing toll

contracts.  In connection to its continued restructuring, the Company stated that it expected to

record significant charges during the fourth quarter.  The quarter was described by defendant

Richard Green as a "real disaster."  The press release stated, in part:

> ". . . . Green summarized third quarter results by saying Aquila's core domestic and international networks contributed more than they did a year earlier, while the **company continued to bear the costs of exiting the troubled energy trading sector.**

> "**The third quarter and the year as a whole have been a disaster for Aquila as well as for our industry,"** said Green. "Exiting the wholesale energy trading business, writing down assets, reducing the workforce by approximately 1,600 employees, cutting and then suspending the dividend all have caused our shareholders and employees a great deal of pain.

> ". . . Merchant Services had a third quarter loss before interest and taxes of $282.1 million, compared to earnings before interest and taxes of $36.6 million in the 2001 quarter. Approximately $215.8 million of this variance relates to non-recurring items. The rest of the decrease, approximately $102.9 million, was due primarily to the company's exit from wholesale energy trading operations.

> Capacity Services

> ". . . .Currently the company has obligations to pay approximately $118.2 million annually under long-term, fixed capacity contracts or leases. . . . For the foreseeable future, the company does not expect this business unit to be profitable. It is essential that the company renegotiate the structure of certain contracts, including its tolling agreements.

> ". . . . Non-recurring charges in the 2002 third quarter are primarily related to impairments resulting from asset sales, losses in connection with winding down the wholesale trading book, and the exit from wholesale energy trading businesses. . . .

> [A chart listed $796.6 million worth of assets Aquila had entered into agreements to sale as of November 13, 2002, along with the net proceeds and the after-tax gain or loss associated with the asset.  This included the sale of UnitedNetworks for $362 million and a gain of $28 million, Natural gas pipeline and processing assets for $265 million and a loss of $156 million, Quanta Services stock for $44 million and a loss of $5.2 million, the Lockport, New York power project for $37.5 million and a loss of $5.3 million, U.K gas storage assets for $34.9 million and a loss of $1.8 million, a development loan for $30.5 million and no gain or

loss and "other business and assets" for $22.7 million and a loss of $3.8 million, for asset sales totaling $796.6 million and resulting in a $144.1 million loss. The chart included a pending sale of Texas gas storage assets for $180 million.]

". . . . Interest Coverage Ratio and Asset Sale Consents

As a result of this year's operating performance, the winding down of merchant energy businesses and the asset sales program, **Aquila does not expect to be in compliance with an interest coverage requirement contained in certain financial arrangements** until at least December 31, 2003.

163.     As a result of the earnings announcement, Aquila stock closed at $2.16, down $1.18, or 35% from the previous day's close of $3.34.

164.     Faced with a financial crisis, Aquila had sold assets totaling more than $796.6 million, closed its energy trading subsidiary and shed 1,600 employees, with plans to cut 200 more, and was in violation of debt covenants. In addition, not only had the value of the shares held in the Plan decreased dramatically, but the millions of shares held by the Plan would no longer receive dividends. On November 14, 2002, *The Kansas City Star* published an article entitled "Facing New Debt Problem, Aquila Eliminates Dividend," that stated that Aquila would have to come to an agreement with its lenders concerning its violations of debt covenants or $2.9 billion in long-term debt would come do, putting the Company in a crises. The article, which described dividends as "the Holy Grail for utility investors" further stated, in part:

News that the dividend would be eliminated stung at least some Aquila shareholders, especially in light of bonuses paid to Aquila executives. Green and his brother Robert, who recently left the company, have been paid about $24 million in bonuses and severance pay this year -- roughly equal to the amount of the total quarterly dividend.

"It's time that the company be run for the benefit of shareholders and utility customers of Aquila," said Jerry Duggan, an investment adviser and Aquila shareholder.

". . . . **For the first nine months of this year, Aquila has lost nearly $1.1 billion, or $7.17 a share, compared with earnings of $285.6 million, or $2.50 a share, for the same period last year.**

"... . Most of the bad financial news for the most recent quarter was from restructuring charges and losses from the discontinued energy trading operation stemming from energy sector fallout in the wake of Enron's collapse.

"... . **The utilities posted third-quarter earnings before interest and taxes of $92.8 million.** Accounting for some one-time charges and a gain, the figure was $1 million more than for the same period last year.

165. In a conference call held on November 14, 2002, the Company commented on the difficulties and charges it was taking as a result of the reduction in its trading assets:

Question: Just getting back to the trading book, on your previous calls you said that next year you'd be getting $110m of the conversion of the trading book to cash and now you're saying $80m. What's the reason for the difference?

Answer by an unidentified executive of the Company: We incurred cost on exiting some of those transactions in 3Q02, which reduced the number down.

"... . What was on our books at the end of 2Q02 was about $390m of net assets related to trading operations, excluding the prepaid contracts and at that time as the book looked at the end of June in an active state, we expected to receive about $110m in the 2003 time period. In an effort to reduce the amount of true volume gas and power we had to buy in 2003, we had to mitigate our prices. We exited many of those contracts. That exiting and price mitigations is what cost us about $70m. So, the book really declined in value from that high $300m range to low $300m range. Some of that decline was in this year and some of that decline took away some future years of cash to be collected on our way to complete price balancing in the books.

166. On November 15, 2002, *Fitch Ratings* downgraded the Company's credit rating to "junk" status. On November 19, 2002, *S&P* followed. Thus, all three major corporate credit ratings companies assigned Aquila's debt a "junk" rating. In a press release issued on November 19, 2002, defendant Richard Green stated "We're sorry to lose our investment-grade rating but we remain well prepared to meet any additional cash requirements that may result."

167. On November 20, 2002, the state of California filed a complaint against numerous energy marketers, including Aquila, alleging inflation of natural gas prices through market manipulation by means including the deliberate reporting of false price and volume information

related to natural gas transactions as well as "wash trading."  See Bustamante v. The McGraw-Hill Companies, Inc., et al, No. BC285598 (Cal. Super. Ct. filed Nov. 20, 2002).

168.    On December 19, 2002, *Global Power Report* published an article entitled "FERC ALJ Ruling Says Power Firms Overcharged Calif. By $1.8-Billion," reporting on a 240-page ruling made on December 12, 2002, by an administrative law judge that found wholesale power suppliers overcharged California by $1.8-billion from October 2000 through June 2001.

169.    On August 29, 2003, *Reuters* published an articled entitled "Aquila Settles FERC Manipulation Charges" reporting that Aquila agreed to settle charges with FERC stemming from allegations raised by the State of California that Aquila had engaged in energy market manipulation activity in California in 2000 and 2001.  As part of the settlement with FERC, Aquila agreed to pay approximately $76,000, although it denied any wrongdoing.

170.    On December 20, 2002, the Company issued a press release announcing that it would not issue guidance for the 2003 fiscal year.  The stock closed that day at $1.61 per share.

171.    On December 23, 2002, *Reuters* published an article entitled "FERC Probes Aquila Electricity Sale to Affiliate," reporting that FERC was investigating a sale of wholesale electricity by Aquila to a company affiliate to determine if the affiliate paid below-market prices. Aquila violated federal rules which provide that a public utility cannot sell power to an affiliate without FERC approval.  The article further stated that FERC questioned Aquila's use of the "Into Cinergy" hub in order to price the transaction.

172.    The FERC investigation into the affiliated deal was closed on June 11, 2003, as the result of an "uncontested settlement."  According to an article entitled "Accepting a Settlement, FERC Takes No Action Against Aquila for Unapproved Deal," published by *Electric Power* on July 14, 2003, the investigation concluded that "the affiliate did not receive

preferential rates" and found no indication of anticompetitive practices. Although FERC staff investigating the matter recommended that Aquila be fined $25,000 "for not following filing procedures and winning commission approval before going ahead" with the transaction, FERC settled the matter without levying a fine "in the interest of avoiding further administrative costs," but ordered Aquila to delay affiliate deals until it gets the commission's permission in the future.

173. On December 24, 2002, *The Wall Street Journal* published an article entitled "How Some Firms Booked Revenue That Was Bogus --- Unraveling of Transaction in Highflying Industries Lowered the Boom on Era" that examined the roll of wash trades and revenue generation in several market sectors, including the energy trading sector. The article details the widespread use of wash trades and swaps in various new commodity markets, including energy and broadband capacity markets, that helped create a façade that such markets were viable and lucrative for participants, when in fact, they were not. These manipulative practices were an integral part of numerous companies' goal of touting and meeting financial expectations by creating false revenue and profits. The article highlighted $5.2 billion and $6.4 billion worth of meaningless swap transactions in the energy markets between 1999 and 2001 by CMS Energy and Reliant Resources, respectively. A substantial number of these trades occurred on the ICE energy market, which Aquila had a 5% ownership interest and "suddenly became more popular . . . after the collapse of Enron and its online exchange." ICE agreements created incentives for its owners/participants to boost volume as they could earn equity by doing such.

174. On February 21, 2003, *Moody's* again downgraded Aquila's credit rating, citing (1) weak cash flow generation relative to total debt; (2) asset sales proceeds not sufficiently reducing debt that was incurred to purchase the same assets; (3) liquidity pressures relating to the

trading business that Aquila was winding down; and (4) the need to extend or replace maturing bank facilities. *Fitch* and *S&P* downgraded Aquila's credit ratings the same week.

175. On March 26, 2003, FERC released an approximately 350-page report resulting from its investigation into possible manipulation of energy markets. The report, which found "epidemic" price manipulation, alleged that Aquila was one of several companies engaged in manipulating energy markets in the western United States in 2000 and 2001. FERC stated that it would likely require $3.3 billion in refunds to California due to the manipulation. The report contended that Aquila was involved in manipulation of natural-gas prices in the Midwest and Eastern United States by providing false prices to publications that compile price indexes and participating in wash trades. The report states that one of Enron's largest participants in wash trades was Aquila. The report cites one instance where an Aquila trader generated $180 million of phantom trades in 40 minutes simply to win a big-screen television that was being offered as a prize by EnronOnline, Enron's electronic trading system.

176. On April 15, 2003, the Company reported a net loss of $977.9 million for the fourth quarter of 2002 and $2.08 billion, or $12.83 per share, for the fiscal year 2002. The losses were attributed primarily to restructuring charges, impairment charges and margin losses incurred during the wind-down of Aquila's merchant trading portfolio and refocus on its core traditional utility operations. During 2002, Aquila sold $1.3495 billion worth of assets. The press release stated, in part:

> "During the second half of 2002, we began our transition from being a major player in the energy trading sector to concentrating on being a service-oriented operator of electric and natural gas utilities located principally in the United States," said Richard C. Green, Jr., Aquila's chairman and chief executive officer. **"We knew that we had a number of serious situations to address, and the necessary action steps we have taken are clearly reflected in the 2002 results.**

".... Aquila recorded restructuring charges of $22.4 million for the fourth quarter and $210.2 million for the year ended December 31, 2002, as described in the table below. The fourth quarter restructuring charges consisted primarily of a loss on the termination of certain aggregator loans to substantially complete Aquila's exit from that business; losses on the exit from certain unfavorable interest rate swaps resulting from the early repayment of debt due to the restructuring of the business; and additional severance and retention payments to employees.

".... Aquila recorded several significant impairment charges in the fourth quarter of 2002 as a result of the change in strategic focus. . .

".... Discontinued Operations
In connection with the sales of its natural gas storage facilities, gas gathering and pipeline assets, merchant loan portfolio and coal handling facility, Aquila reported the results of these businesses as discontinued operations in its consolidated income statements for the three years ended December 31, 2002. Included in the 2002 loss from discontinued operations were net pretax losses on sales of assets of $184.0 million related to the merchant loan portfolio that was recorded in the fourth quarter of 2002 and a $240.3 million loss related to the gas gathering and pipeline assets that was recorded in the third quarter.

Liquidity
Aquila experienced significant net losses and negative cash flows from operations in 2002. It also experienced a number of credit downgrades and currently is rated non-investment grade. This caused the company to post a substantial amount of cash or letters of credit as collateral on a number of contractual agreements. As a result of the 2002 losses, Aquila was in violation of an interest coverage ratio covenant and a covenant that requires maintaining a specified debt to capitalization ratio.

". . . .Restatement of 2000 and 2001 Cash Flow Statements

Aquila's consolidated statements of cash flows included in its Form 10-K filed today have been restated for the years ended December 31, 2001 and 2000. These changes had no impact on earnings or losses.

Between 1997 and 2000, Aquila was paid in advance on certain long-term contracts that were treated as operating activities for cash flow purposes. As a result of developments in industry accounting and guidance in 2002, these cash flows are now required to be shown as financing activities. As a result, cash flow from operating activities increased in 2001 by $82.2 million and decreased in 2000 by $396.1 million. Cash flows from financing activities were changed by corresponding amounts.

". . . . Domestic Networks reported a loss before interest and taxes of $829.6 million for 2002 compared to earnings before interest and taxes (EBIT) of $117.9 million for 2001. As noted above, this decrease was primarily the result of $932.7 million of impairment charges and net losses on sales of telecommunications assets and investments as well as $21.3 million of restructuring charges resulting from the realignment of Aquila's domestic utility businesses.

". . . . Wholesale Services reported a loss before interest and taxes of $566.0 million in 2002 compared to EBIT of $224.9 million in 2001. This loss included impairment charges of $182.1 million, and restructuring charges of $173.8 million.

In addition, the lack of price trends and lower volatility, the record earnings in 2001 and the exit from the wholesale trading business led to a decrease in gross profit for Wholesale Services operations of $726.3 million in 2002 compared to 2001.

The unit incurred $115.8 million in losses in 2002 as a result of actions to balance counter party positions, reduce open positions and terminate existing contracts. Also impacting results were unfavorable movements in credit, liquidity and interest reserves, unfavorable movements in trading positions that were not fully hedged, and unfavorable adjustments related to final settlements. These 2002 losses are in comparison to record earnings in 2001.

177.    During the conference call held the same day to discuss the earnings announcement, defendant Richard Green told analysts, "**looking back, there are a number of signals we should have acted on.**"   The Company also announced that it expected to post losses through 2003 and into 2004.

178.    On April 22, 2003, Aquila announced that it reached an agreement to sell all of its Australian interests.  This was part of its efforts to increase liquidity and would lead to its eventual exit from the energy business in Australia, New Zealand, Canada and United Kingdom.

179.    On May 15, 2003, Aquila reported net losses of $51.9 million for the first quarter of fiscal year 2003 and attributed the loss primarily to trading and contract losses.

180.    During the Company's annual meeting held on June 4, 2003--with the Company's stock trading at $2.79 (down $35.06, or **93%,** from its high of $37.85 on May 22, 2001), having

wiped out hundreds of millions of dollars from Plan participants' retirement funds, ignored

adequate funding of the Plan, and enriched himself and his brother with millions of dollars--the

Aquila CEO apologized to shareholders and finally admitted that Aquila's stock was "a

speculative stock."  Despite this characterization, defendants failed to inform Plan participants

that the Company had been considering bankruptcy.  See ¶192.  At this annual meeting the

Company did not ask employees who held Aquila stock to stand up, unlike it had the past.  An

article published the same day by *The Associated Press*, entitled "Aquila CEO Apologizes to

Shareholders," states:

> Aquila Inc.'s chief executive apologized to shareholders at the energy company's annual meeting Wednesday for the firm's financial troubles.
>
> **Richard Green Jr. said** Aquila, which lost $2.1 billion during the last fiscal year and eliminated its dividend, **should have left the energy-trading business sooner** and should have given up earlier its investment in Quanta Services Inc.
>
> ". . . . Green said Wednesday he had heard "painful" and "downright gutwrenching" stories from Aquila's shareholders in the last few months, and if he were one of them, he would want an apology.
>
> "So to each and every one of you, I apologize," he said.
>
> ". . . . Aquila was one of several energy traders to run into trouble after Enron Corp., the industry's pioneer, went bankrupt amid a scandal over improper accounting. After the meeting, Green told reporters perhaps the company should have foreseen investors losing confidence in other energy traders, such as Aquila, because of the Enron scandal.

181.     On July 10, 2003, *The Kansas City Star* published an article entitled, "Aquila

Investigates Accounting, Transactions, Bonuses," reporting that Aquila had initiated an internal

investigation of its accounting practices and energy trading activities as a result of an anonymous

letter to the Aquila Board of Directors alleging extensive fraud.  The letter first surfaced on May

12, 2003.  Almost immediately, the Company issued a response to the article, stating the

allegations were without merit.  A July 14, 2003, *Electric Utility Week* article provided expanded

details of the allegations, which fell into four groups of allegations. The first set alleged that defendants Richard Green and Robert Green had falsified 2000 and 2001 earnings reports through mark-to-market and mark-to-model abuses, the changing of Aquila's reporting on energy deals from a net basis to a gross basis allowing for significant jumps in revenue, and falsified transactions, as detailed in the FERC's 400-page staff report on Western market manipulation, in order to increase executive bonuses.[2] According to the letter, this resulted in an increase of reported revenues from approximately $2 billion to $40 billion without any substantive change in underlying business activity or profitability. The second set alleged that senior executives of Aquila made millions of dollars in improper payments, and diverted Company assets and contracts, to businesses controlled by themselves or their friends and families. The letter further alleged that Aquila bribed foreign government officials and provided them with false information in order to receive funding for certain projects. Lastly, the letter alleged that Aquila had structured real estate transactions to personally benefit defendant Richard Green and Robert Green and other senior executives.

182. On March 8, 2004, *The Associated Press* published an article entitled "Aquila Investigation Turns Up No Wrongdoing" reporting that after completing its internal investigation into the anonymous letter's allegations, Aquila had found no evidence to support the allegations.

183. Throughout 2003 Aquila sold assets in order to sustain the Company as it returned to its traditional business as an electric and natural gas utility. On July 24, 2003, *The Associated Press* published an article entitled "Aquila Completes Sale of Australian Investsments" reporting

---

[2] The FERC report was released in March of 2003, named Aquila and other top industry players as wash-trade counterparties with Enron on the EnronOnline ("EOL") trading platform. The report alleged that the most wash trades of power recorded on EOL were with Aquila Energy Marketing.

on Aquila's announcement that it expected $477 million from the sale of its Australian energy investment. It also noted that Aquila received $629 million from the sale of interests in United Energy Limited, AlintaGas and Multinet Gas, and had reduced its debt by $1 billion since 2002.

184. On August 12, 2003, Aquila issued a press release reporting a net loss of $80.6 million, or $0.41 per share, for the second quarter of its fiscal year 2003. The loss was attributed as "primarily due to restructuring and impairment charges related to last year's decision to reshape the business to be a regulated utility." During the quarter, Aquila recognized a total loss of $103 million due to impairment charges and a loss on the sale of assets, including a $2.6 million loss from selling its interest in AlintaGas and a $105.5 million payment to get out of an unprofitable energy contract called a tolling agreement. Aquila's regular utility business made $10.9 million before interest costs and taxes. The Company reported that it had generated total proceeds of $1.7 billion from the asset sale program it had begun in the second quarter of 2002.

185. During the conference call held as part of its second quarter of 2003 earnings announcement, defendant Richard Green discussed recent regulatory investigations. Richard Green stated that Aquila had resolved the FERC investigation into the misreporting of energy trades to index publications by instituting corrective policies to eliminate future transgressions, continued to cooperate in both the FERC probe of price manipulation in California and the CFTC investigation into wash trades and the misreporting of energy trades. Defendant Richard Green acknowledged that "probably. . . some of our traders hav[e] misreported trades."

186. On September 16, 2003, Aquila announced that it had reached an agreement to sell its Canadian utility operations for approximately $990 million, marking a nearly completed exit from the international utility business. This marked another step in Aquila's transition to once again becoming an entirely regulated utility, which, according to a *The Kansas City Star*

article published on September 16, 2003, entitled "Aquila to Sell Canadian Assets," would

"ensure stable cash flow and revive [Aquila's] debt rating, which ha[d] fallen to junk status."

187.    On November 6, 2003, Aquila reported a $169.9 million loss for its third quarter

2003, largely reflecting costs associated with its winding down of its wholesale energy business

and continued asset sales.  From the second quarter of 2002 through the third quarter of 2003, the

Company had raised $1.9 billion through asset sales.  Yet, commenting on the financial

condition of the company, defendant Richard Green stated "Aquila still has significant work

ahead to ensure a firm foundation for the company."  The announcement stated, in relevant part:

> The loss in this year's third quarter is primarily due to impairment charges related
> to the decision to sell investments in independent power plants, mark-to-market
> losses resulting from decreases in natural gas prices, unfavorable foreign currency
> movements and higher interest costs associated with the company's non-
> investment grade credit rating.
>
>     ". . . . Impairment Charges
>
> Aquila recorded $138.4 million in impairment charges and net loss on sale of
> assets in the third quarter of 2003, compared to impairment charges of $275.6
> million in the 2002 third quarter. These amounts include charges in discontinued
> operations. In this year's quarter, Capacity Services incurred a charge of $135.4
> million for the impairment of the company's investments in independent power
> plants, all of which are in the process of being sold with closing expected in early
> 2004. International Networks recorded a $4.0 million loss reflecting the reduced
> value of Midlands Electricity based on its pending sale to Powergen.
>
> Future impairment charges are possible as Aquila continues to revert to being a
> regulated utility business.
>
>     ". . . . The EBIT results for the 2003 third quarter include non-cash losses
> of approximately $26.9 million related to the discounting of the trading portfolio.
> Substantially all of these losses relate to long-term gas contracts. . . .

188.    On January 28, 2004, *Platts Commodity News* published an article entitled "US

CFTC Imposes $50-Mil in Penalties on Six Energy Trading Firms" that reported that the CFTC

had settled charges that alleged Aquila Merchant Services manipulated natural-gas prices from at

least January 1999 to June 2002, by providing false prices and other transaction information to publications that use such data to calculate the price indexes.  As part of the settlement, Aquila was ordered to pay $26.5 million to the CFTC.  Of the six energy trading firms the CFTC simultaneously settled with, Aquila received the largest fine.  Of the 13 fines levied against any company as part of the CFTC investigation into the submission of false natural gas prices, only one company would receive a heavier fine - Duke Energy was fined $28.5, just $2 million more than Aquila's fine - and the next largest fine after Aquila's was $16 million.  Reporting on the settlement, *The Kansas City Star* published an article on January 29, 2004, entitled "Aquila Will Pay Millions in Fines; Penalties Assessed for Pricing Scheme," that attributed federal officials as stating that the differences in the amount of the penalties reflected the "scope, gravity and nature of the violations," including that Aquila had submitted, until June 2002, false gas trade prices and volumes to trade publications, such as Inside FERC, that use the data to calculate price indexes.  The article noted that separate investigations by FERC during the previous year had found that, in at least one instance, a top Aquila manager told a trader to provide the false information and that Aquila sought to manipulate natural-gas prices in the Midwest and East.

189.     Aquila's failed venture into the unregulated energy trading markets and the costly consequences continued to cause the Company significant problems and expenses through 2004.  Summarizing two such ongoing complications, one involving the validity of a three year old acquisition and the other involving one of Aquila's many asset sales, *Platts Electric Utility Week* published an article entitled "Aquila Answers Attacks on Merger Motive by Calling Its Critis 'Flat Earth' Believers" which stated, in part:

> Both fronts in the battle involve Aquila's costly foray into the international and unregulated worlds it now has abandoned.

". . . . Merger-related rate relief "stems entirely from its non-regulated activities," he said. "The decision to acquire SJLP was based on the Company's expectations that this would lead to improved financial and strategic outcomes for its non-regulated activities. Without these expectations, the merger would never have occurred." Aquila "appears to see customers as a 'safety net'," he said, to protect investors from "the poor management decisions that led to the merger.". . .

190.     In its ongoing effort to shore up its balance sheet, Aquila attempted to refinance debt by offering assets used by its regulated utility operations as collateral for the newly refinanced debt. This effort was consistently frustrated by regulators who refused to allow Aquila to put up regulated assets in order to get itself out of from underneath the financial strains caused by Aquila's failed gamble in the unregulated energy trading markets. On February 5, 2004, *The Associated Press* published an article entitled "Minnesota Regulators Refuse to Reconsider Aquila's Request" reporting that Minesota regulators had refused to reconsider Aquila's request to use utility assets as collateral to back a $430 million loan, resulting in Aquila being unable to receive a lower interest rate on the loan. This decision mirrored that of other regulators who refused similar requests. With higher interest loans, Aquila's road to recovery would be that much more difficult, putting the future of the value of the Company and its stock into question.

191.     On February 10, 2004, *The Kansas City Star* published an article entitled "Aquila Records Could Face Audit" detailing the continued internal control problems within Aquila, as well as the severe impact its financial condition was having on Aquila's "ability to provide safe, sufficient electricity at just and reasonable rates." The article stated, in relevant part:

> Kansas utility regulators on Monday told their staff to study whether an independent audit and review was needed of Aquila Inc.'s record keeping and related management practices.
>
> ". . . . But the regulatory staff was critical of the company and its failure to provide some requested information to help the staff determine the financial impact of the sale. According to the staff, the company stated that some financial

information wasn't available because of turnover at Aquila and changes in computer systems.

". . . . The need for Kansas to approve the sale of the plants came after a standstill order last May that gave the commission authority to review various Aquila actions because its debt load had compromised Aquila's "ability to provide safe, sufficient electricity at just and reasonable rates."

192.    Despite the billions of dollars of asset sales and the heightened efforts to shore up

the balance sheets of the Company, Aquila remained in a depressed financial state.  So troubled

was the Company's financial position that the company raised the possibility of filing

bankruptcy if certain regulatory approvals were not provided to allow the Company to use its

utility assets as collateral.  This was first reported on February 19, 2004, by *The Kansas City Star*

in an article entitled "Aquila Indicated Possible Bankruptcy."  The article stated:

Kansas regulators, in rejecting Aquila Inc.'s request to use utility assets as collateral, said the company once raised the possibility of bankruptcy if approval wasn't given.

". . . . "Aquila raised the possibility of bankruptcy to argue that collateralization is necessary, and would improve the ratepayers' situation by lessening the chances the firm would have to enter bankruptcy," according to the order.

". . . . Aquila executives said Wednesday that conditions were different early last year when they filed requests for the regulatory approval. At that time, some unregulated assets that they knew would be sold were covering part of the loan meant to cover expenses of the regulated utilities. If sufficient regulated assets weren't available by the time the unregulated assets were sold, there could have been a problem.

"Then we would have been faced with a financial situation," said Jon Empson, a vice president with Aquila.

". . . . But the prospect of bankruptcy has shadowed the regulatory proceedings in all the states where Aquila has sought permission to use utility assets as collateral. It was an issue in Minnesota, which rejected the request, and in Missouri, where a decision is expected to be released soon. Even in Iowa, which approved the request late last year, regulators said in their order that "pledging Iowa assets may not be enough to ensure that Aquila avoids bankruptcy

in the future, but under current conditions pledging the assets should have a positive effect on Aquila's access to capital markets."

"... But Kansas regulators said that they were concerned about 2006, when the $430 million loan comes due. Aquila, the commission's order said, has no plan to pay off the loan, so it must be inferred that the company would have to default or refinance the loan at that time. But Empson said that he expected Aquila to have other ways to deal with the loan by 2006, and that Aquila had mentioned another possible option in a confidential filing with the Kansas regulators.

193.     On March 10, 2004, Aquila reported a loss of $34 million for the fourth quarter of 2003 and a loss of $336.4 million, or $1.73 a share, for fiscal year 2003, marking the seventh consecutive quarter of losses.  The losses reflected continued restructuring costs.  This compared to a loss of $2.1 billion, or $12.83 a share, during its fiscal 2002.

194.     During the conference call held in connection with the fiscal year 2003 earnings announcement, Rick Dobson, then CFO of Aquila, stated that the merchant services losses were largely due to losses related to tolling contracts, in addition to long-term contract amortization losses.  Rick Dobson further commented on the financial report:

Merchant services for 2003. . . In connection with our repositioning plan Aquila recognized 88 million in impairment losses related to the held for sale equity investments in certain IPPs, 106 million to settle the Acadia tolling contract, and 23 million to break certain interest rate swap contracts in connection with the retirement of certain gas-fired generation, synthetic leases in April of 2003. There's 75 million in costs related to 1200 megawatts of owned peaking capacity and the 600 megawatt Elwood and 580 megawatt Acadia tolling contract which was settled in May of 2003.

54 million of long-term gas contract amortization losses and assurety wrap costs many of which continued into the fall of 2012 were also recorded in 2003. 27 million of 2003's performance related to the exit of certain long-term transportation contracts. A 26 million loss of accrual in connection with the CFTC settlement was recorded in 2003. And increases in EBIT related to the discounting of long-term gas contract derivative instruments and the associated hedges were more than offset by cost to wind down our Europe merchant operations, certain other domestic merchant contract exits, Onadoga(ph) heat rate swap hedge volatility and alternative risk contract losses. These items netted to an aggregate

2003 loss of approximately $26 million. Those are the primary drivers behind the 406.7 million EBIT losses in that segment.

195. On May 5, 2004, Aquila reported a loss of $51.8 million, or $0.26 per share, for the first quarter fiscal 2004. According to the press release issued the same day, these results "primarily reflect losses associated with the continued wind-down of the company's wholesale energy trading portfolio, the sale of non-core assets and interest costs." The Company again reiterated the significant impact that the financial fallout costs the Company. Specifically, the Company made the following comment regarding its liquidity in the May 5, 2004, press release:

Since reporting significant net losses and negative cash flows from operations in 2002, Aquila has had to operate with non-investment grade credit ratings. This affected the company's ability to raise capital through traditional financial markets. Aquila has therefore relied primarily on its existing cash position and proceeds from asset sales to meet its capital needs, and expects to continue relying on these sources during the remainder of its restructuring process.

196. The Company commented on continued losses in its Merchant Services unit:

Merchant Services reported a loss before interest and taxes of $126.3 million for the 2004 first quarter, compared to a loss of $107.9 million for the 2003 quarter. Gross loss for the first quarter was $77.9 million in 2004 and $93.9 million in 2003.

The current year loss reflects an approximately $21.2 million non-cash loss related to the discounting of Aquila's remaining trading portfolio, primarily driven by long-term gas contracts; margin losses of $14.1 million related to the delivery of gas under long-term gas contracts. . . approximately $9.9 million of costs to exit natural gas hedge positions; mark-to-market losses and unfavorable settlements of approximately $16.0 million; and $35.9 million of net loss on sale of assets. . . .

197. During the conference call held as part of the first quarter 2004 earnings announcement, defendant Richard Green stated that the trade book remaining from its energy trading business was insignificant and that the Company was mostly finished with the various investigations into its fraudulent activity in the Merchant Services unit. Defendant Richard Green also stated that Aquila expected losses for 2004 and foresaw possible further impairments.

198.    Reporting on Aquila's Annual meeting held on May 5, 2004, *The Kansas City Star* published an article entitled "We've Still Got Work To Do," which stated, in relevant part:

The head of Aquila Inc. told shareholders Wednesday that the company continues to make headway, but he couldn't say when reorganization will be completed or a dividend reinstated.

"We've made some real progress, but we've still got work to do," Richard Green Jr., the company's chief executive officer, told about 200 shareholders and employees who attended the annual meeting in Kansas City.

". . . . In the past year, it also disposed of two "tolling" agreements, in which Aquila had to pay millions in fees for the right to buy power from specified power plants. That and other tolls were part of the company's unregulated business.

But other parts of the restructuring are taking longer than expected. The company has so far been unable to terminate the Elwood tolls, in which the company pays $37 million to buy power from two power plants near Chicago. . . .

In response to a shareholder's question, Green said he couldn't say when the company will be able to again pay a dividend, but with employees owning 5 percent of the company's shares, "all of them want to pay a dividend as badly as you do."

". . . . Another shareholder asked whether Aquila's executive compensation is still too high. . . .

In other remarks, Green said the company considered bankruptcy last year when it was negotiating a replacement for a credit line, which it eventually achieved with a $430 million loan. The talk about bankruptcy then faded.

199.    On May 31, 2004, *Market News Publishing* announced that Aquila had completed the sale of Aquila Networks Canada (Alberta) Ltd. to Fortis Inc. for "$1.08 billion, including the assumption by Fortis of $113 million in debt."

200.    In a letter to shareholders, dated June 9, 2004, defendant Richard Green stated:

Our employees own about 5 percent of our outstanding shares. They not only are an extremely dedicated team; they also have a vested interest in making our success real. I remind them frequently that plenty of serious challenges remain. Based on their performance over the past two years, I have ample reason to believe that they will continue to rise to the occasion.

Despite defendant Richard Green's apparent belief in his employees, along with his wish that they "rise to the occasion" to ensure Aquila's continued survivability, defendant Richard Green and other executives still had not returned to the Company any of the roughly $30 million in bonuses, not counting stock options, received for 2001 which employees and shareholders rightfully requested they return. *See supra* ¶138 ("Bonuses for Aquila Executives Raise Eyebrows," *The Kansas City Star* (July 7, 2002).

201. The June 9, 2004 letter to shareholders also included a "frequently asked questions" section which contained an attempted explanation of the events surrounding the deterioration of the Company.

202. On June 23, 2004, *The Kansas City Star* published an article entitled "Ruling Clouds Aquila's Future" reporting on the issuance of a preliminary injunction preventing Aquila from using $504 million in proceeds from the sale of its Canadian utilities as it desired, and, instead, required the Company to use those proceeds to serve as collateral for prepaid contracts for natural gas that the Company was obligated to deliver to municipal utilities. CFO Dobson was quoted as saying that the legal rulling puts the Company at risk.

203. Despite the above-described events, including the losses of earnings for numerous consecutive quarters, the imminent threat of a credit-cliff and the subsequent downgrades of the Company's credit ratings by all major credit rating companies, the continued struggle to sell Company assets in order to meet growing liquidity requirements, the significant state and federal government investigations by the SEC, FBI and FERC, the looming threat of bankruptcy and as the stock was plummeting over that time over 93%, defendants never advised Plan participants that investments in the Aquila Stock Option had evolved into a high risk game, or that the entire energy trading sector that Aquila had wrapped itself into was fraught with risk and manipulative

practices. Nor did defendants at any time consider limiting Plan investment in the Aquila Stock Option or consider eliminating the Aquila Stock Option. Instead, incredibly, defendants continued to encourage and allow employees to invest their retirement assets in the Aquila Stock Option in the same ways as had become customary.

204.    Aquila stock closed at $3.19 per share on September 20, 2004.

## BREACHES OF FIDUCIARY DUTY

### COUNT ONE – DUTY TO DISCLOSE AND INFORM
### (AGAINST ALL DEFENDANTS)

205.    ERISA § 404(a)(1)(A) (29 U.S.C. § 1104(a)(1)(A)) imposes on a plan fiduciary a duty of loyalty – that is, a duty to "discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and . . for the exclusive purpose of . . . providing benefits to participants and their beneficiaries . . . ." . Section 404(a)(1)(B) (29 U.S.C. § 1104(a)(1)(B)) also imposes on a plan fiduciary a duty of prudence – that is, a duty to "discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and . . . with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims . . . ."

206.    A plan fiduciary's duties of loyalty and prudence include a duty to disclose and inform. This duty embodies: (1) a duty not to misinform (2) an affirmative duty to inform when the fiduciary knows or should know that silence might be harmful; and (3) a duty to convey complete and accurate information material to the circumstances of participants and beneficiaries. This duty to disclose and inform recognizes the disparity that may exist, and in this case did exist, between the training and knowledge of the fiduciaries, on the one hand, and the participants and beneficiaries, on the other. In a plan with various funds available for

investment, this duty to inform and disclose also includes: (1) the duty to impart to plan participants material information of which the fiduciary has or should have knowledge that is sufficient to apprise the average plan participant of the risks associated with investing in any particular fund; and (2) the duty not to make material misrepresentations.

207. By no later than the beginning of the Class Period, defendants breached their fiduciary duties to disclose and inform with respect to the Plan's use of employer stock as a Plan investment and as an investment alternative. Particularly, the investment in the Company's stock was an investment in a single company's stock which carried with it risks far beyond the risks of an investment in a diversified investment such as a mutual fund. Moreover, the nature of Aquila's business focus changed dramatically during the Class Period in a manner that substantially increased the risk of holding Aquila stock, thereby making the duty to provide complete and accurate information about investing in the Company's stock essential.

208. Throughout the Class Period, rather than satisfying their fiduciary duties by providing complete and accurate information to the Plan's participants and beneficiaries regarding the risks of investing in Company stock, defendants concealed material information from Plan participants and actively misled Plan participants about the appropriateness of investing in Company stock and about the Company's earnings prospects and business condition. Plan participants were also directly encouraged to continue to make and maintain substantial investments in Company stock in the Plan through the Aquila Stock Option.

209. While ERISA duty to disclose and inform does not require Plan fiduciaries to violate the securities laws, defendants' timely disclosure of the information that they withheld would not have been prohibited by the securities laws. Rather, such timely disclosure of information would have been consistent with the securities laws. Moreover, it would have been

consistent with the securities laws for defendants to remove Aquila stock as a Plan option and to cease using Aquila stock as a matching contribution. The securities laws did not require defendants to continue to injure the Plan by continuing to purchase stock that defendants knew or should have known was artificially inflated. Rather, defendants had the option to alert the appropriate regulatory agencies and cease furthering the improprieties.

## COUNT TWO – DUTY TO ELIMINATE OR LIMIT INAPPROPRIATE INVESTMENT OPTIONS
### (AGAINST ALL DEFENDANTS)

210.    Plaintiff realleges and incorporates by reference herein the foregoing paragraphs.

211.    Under the terms of the Plan, the defendant members of the Pension Committee had the authority to add and eliminate investment alternatives under the Plan.

212.    During the Class Period, the defendant members of the Pension Committee either knew or were in a position to discover the facts relevant to the suitability of Aquila stock as an investment option under the Plan, as well as whether Aquila stock was fairly priced.

213.    A fiduciary's duties of loyalty and prudence entail a duty to conduct an independent investigation into, and continually to monitor, the merits of all the investment alternatives in the Plan, including employer securities, to ensure that each investment is a suitable option for the Plan. Defendants breached this duty of investigation and monitoring with respect to Company stock. By no later than the beginning of the Class Period, defendants could not have reasonably made a determination that Company stock was a suitable investment for the Plan, either for a participant's discretionary account or for the match. In fact, by the beginning of the Class Period, the Company stock was clearly an unsuitable investment option for the Plan.

214.    A fiduciary may not avoid his fiduciary responsibilities by relying solely on the language of the plan documents. While the basic structure of a plan may be specified, within

limits, by the plan sponsor, the fiduciary, including a plan sponsor-fiduciary, may not blindly follow the plan document if doing so leads to an imprudent result. ERISA §404(a)(1)(d) (29 U.S.C. § 1104(a)(1)(D)). To the extent that defendants followed the direction of the Plan documents, for example, in continuing to place the match in Company stock during the Class Period and continuing to maintain Aquila stock as an investment option, they further breached their fiduciary duties.

## COUNT THREE – DUTY TO AVOID CONFLICTS OF INTEREST
## (AGAINST ALL DEFENDANTS)

215. Plaintiff realleges and incorporates by reference herein the foregoing paragraphs.

216. The fiduciary duty of loyalty includes a duty to avoid conflicts of interest and to resolve them promptly when they occur. A fiduciary must always administer a plan with an "eye single" to the interests of the participants and beneficiaries, regardless of the interest of the fiduciaries themselves or the plan sponsor.

217. Defendants breached their duty to avoid conflicts of interest and to promptly resolve them when they occur by continuing to allow and encourage the investment in Company stock as a Plan investment option during the Class Period, by failing to engage independent fiduciaries who could make independent judgments concerning the Plan's investment in Company stock and the information provided to participants and beneficiaries concerning it, and generally, by failing to take steps necessary to ensure that the fiduciary of the Plan did not suffer from a conflict of interest, including the notification to the Department of Labor of the deficiencies which made employer stock an unsuitable investment for the Plan.

## COUNT FOUR – DUTY TO MONITOR PENSION COMMITTEE
## (AGAINST DEFENDANT AQUILA AND DEFENDANT MEMBERS OF THE BOARD
## OF DIRECTORS)

218. Plaintiff realleges and incorporates by reference herein the foregoing paragraphs.

219.     As the fiduciary with the authority to appoint and remove members of the Pension Committee, defendant Aquila, acting through its Board of Directors and the defendant members of the Board of Directors, had a duty to monitor the conduct of the Pension Committee to assure that they were performing their duties consistently with the requirements of ERISA.

220.     Because these defendants knew or should have known of the failure of the Pension Committee to fulfill its fiduciary responsibilities, these defendants breached their fiduciary responsibility by failing to replace the members of the Pension Committee with persons who would act to protect the participants and beneficiaries of the Plan from inappropriate investments in Aquila stock.

### COUNT FIVE – CO-FIDUCIARY DUTY UNDER SECTION 405
### (AGAINST ALL DEFENDANTS)

221.     Plaintiff realleges and incorporates by reference herein the foregoing paragraphs.

222.     Section 405(a) of ERISA, 29 U.S.C. § 1105 provides as follows:

(a)     Circumstances Giving to Liability – In addition to any liability which he may have under any other provision of this part, a fiduciary with respect to a plan shall be liable for a breach of fiduciary responsibility of another fiduciary with respect to the same plan in the following circumstances:

(1)     if he participates knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary, knowing such act or omission is a breach;

(2)     if, by his failure to comply with section 404(a)(1), 29 U.S.C. § 1104(a)(1) in the administration of his specific responsibilities which give rise to his status as a fiduciary, he has enabled such other fiduciary to commit a breach; or

(3)     if he has knowledge of a breach by such other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach.

223.     By the conduct alleged above, each of the defendants knowingly participated in the breaches of their co-fiduciaries, failed to fulfill their own fiduciary responsibilities as set forth in Section 404 of ERISA so as to enable the breaches by their co-fiduciaries, and failed to take reasonable steps to correct the breaches by their co-fiduciaries of which they had knowledge.

## COUNT SIX – KNOWING PARTICIPATION IN A BREACH OF FIDUCIARY DUTY (AGAINST ALL DEFENDANTS)

224.     Plaintiff realleges and incorporates by reference herein the foregoing paragraphs.

225.     To the extent that any of the named defendants are found not to have been fiduciaries or to have acted in a fiduciary capacity with respect to the conduct alleged to have violated ERISA, each such defendant has knowingly participated in the breaches of those defendants who were fiduciaries and acted in a fiduciary capacity and as such are liable for equitable relief as a result of participating in such a breach.

## CAUSATION

226.     Because substantial assets in the Plan were invested in Company stock during the Class Period as a result of defendants' breaches of their fiduciary duties, the Plan suffered a loss that damaged plaintiff and other members of the Class.

227.     As fiduciaries, defendants were responsible for the prudence of investments in the Plan during the Class Period, unless participants in the Plan themselves exercised effective and informed control over the assets in the Plan in their individual accounts pursuant to ERISA § 404(c) (29 U.S.C. § 1104(c)) and the regulations promulgated therein.  Plan participants did not

exercise control pursuant to this statute because defendants failed to provide complete and accurate disclosures and to meet applicable regulatory requirements. As a consequence, defendants were responsible for ensuring that all investments, including investments in Company stock, were and remained prudent. Defendants are therefore liable to the Plan and to Plan participants for damages resulting from imprudent investments in Company stock, by the Plan and/or by Plan participants, without regard to whether or not the participants relied upon defendants' statements, acts or omissions.

228. The Plan also suffered a loss, and plaintiff and the other Class members were damaged, by defendants' above-described conduct during the Class Period, because defendants' materially deceptive statements, acts and omissions were designed to deceive plaintiff and the other members of the Class about the prudence of making and maintaining investments in Company stock. Where a breach of fiduciary duty consists of, or includes, misrepresentations and omissions material to a decision by a reasonable participant that results in harm to the participant, the participant is presumed as a matter of law to have relied upon such misrepresentations and omissions to his or her detriment. Defendants' above-described statements, acts and omissions constituted misrepresentations and omissions that were fundamentally deceptive concerning the prudence of investments in Company stock and were material to any reasonable person's decision about whether or not to invest or maintain any part of one's plan assets in Company stock during the Class Period. Plaintiff and other Class members are therefore presumed to have relied to their detriment on defendants' deceptive statements, acts and omissions.

# REMEDY FOR BREACHES OF FIDUCIARY DUTY

229.     ERISA § 502(a)(2) (29 U.S.C. § 1132(a)(2)) authorizes a plan participant to bring a civil action for appropriate relief under section 409 (29 U.S.C. § 1109). Section 409 requires "any person who is a fiduciary with respect to a plan who breaches any of the . . . duties imposed upon fiduciaries . . . to make good to such plan any losses to the plan . . . ." Section 409 also authorizes "such other equitable or remedial relief as the court may deem appropriate . . . ."

230.     In determining the losses to a plan as a result of breaches of fiduciary duty, there is a presumption that, but for the breaches of fiduciary duty, the participants and beneficiaries in the plan would not have made or maintained its investments in the challenged investment and, where alternative investments were available, the investments made or maintained in the challenged investment would have instead been made in the most profitable alternative investment available. In this way, the remedy restores the values of the plan's assets to what they would have been if the plan had been properly administered.

231.     Plaintiff and the Class are therefore entitled to relief from defendants in the form of (1) a monetary payment to the Plan to make good the Plan's losses resulting from the breaches of fiduciary duties alleged above in an amount to be proven at trial based on the principles described above, as required by ERISA § 409(a) (29 U.S.C. § 1109(a)); (2) injunctive and other appropriate equitable relief to remedy the breaches alleged above, as provided by ERISA §§ 409(a) and 502(a)(2)&(3) (29 U.S.C. §§ 1109(a) and 1132(a)(2)&(3)); (3) reasonable attorney fees and expenses as provided by ERISA § 502(g) (29 U.S.C. § 1132(g)), the common fund doctrine, and other applicable law; (4) taxable costs; and (5) interest on some or all of these amounts as provided by law.

## **PRAYER**

232.     Plaintiff and the Class pray for judgment against defendants for a monetary

payment to the Plan, injunctive and other appropriate equitable relief, reasonable attorney fees

and expenses, taxable costs, interest, and such other relief as the Court may deem just and

proper.

Dated:  September 24, 2004                        Respectfully submitted,


                                         By:*/s/* Bruce Keplinger
                                                Bruce Keplinger, Esq. ID # MO30481
                                                NORRIS & KEPLINGER, LLC
                                                6800 College Boulevard
                                                Suite 630
                                                Overland Park, KS 66211
                                                Telephone: (913) 663-2000
                                                Facsimile: (913) 663-2006

                                                **WOLF HALDENSTEIN ADLER
                                                  FREEMAN & HERZ, LLP**
                                                Fred Taylor Isquith, Esq.
                                                Michael Jaffe, Esq.
                                                Christopher S. Hinton, Esq.
                                                270 Madison Avenue
                                                New York, NY 10016
                                                Telephone: (212) 545-4600
                                                Facsimile: (212) 545-4653

                                                **LAW OFFICES OF MAX D. LEIFER, P.C.**
                                                Ira H. Zuckerman, Esq.
                                                434 Broadway – 4th Floor
                                                New York, NY 10013
                                                Telephone: (212) 334-9699
                                                Facsimile: (212) 966-9544